[Civ. No. 30036. First Dist., Div. One. Dec. 12, 1972.]

WILLIAM J. HOLAYTER, Plaintiff and Respondent, v.
ROY SMITH et al., Defendants and Appellants.

## COUNSEL

Rosenberg & Wiseman and Milton D. Rosenberg for Defendants and Appellants.

Morgan, Beauzay & Hammer and W. Robert Morgan for Plaintiff and Respondent.

## OPINION

**MOLINARI, P. J.**—This is an appeal by Roy Smith and Jerry Smith (hereinafter referred to as the "Smiths") from a judgment entered in favor of William J. Holayter, individually and in a representative capacity for and on behalf of the International Association of Machinists and Aerospace Workers District Lodge No. 93 (hereinafter referred to as the "Union") in an action by the Union for specific enforcement of a collective bargaining agreement.

### Statement of the Case

The Union filed a complaint against the Smiths, Welding Service Company (hereinafter referred to as "Welding") and Bruno DeValle for specific enforcement of a collective bargaining agreement. The Union alleged that DeValle and Smith were the owners of Welding and that they entered into a written agreement with the Union on April 3, 1968, by the terms of which the owners agreed to recognize the Union as the bargaining agent for their employees and to pay certain union benefits, wages and other fringe benefits. The Union alleged that it had complied with the terms of the agreement, but that defendants had breached the agreement by refusing to comply with its provisions despite demands by the Union for recognition and compliance. The Union prayed that defendants be ordered to comply with the terms of the agreement and to pay retroactively to the employees the wages and benefits to which they were entitled under the agreement.

At the trial the Union advised the court that it only sought injunctive relief. Upon conclusion of the trial a judgment was entered in favor of the Union wherein defendants were enjoined and ordered to comply with every provision of the bargaining agreement and were ordered to recognize the Union as the bargaining agent for the employees at Welding.

## The Facts

DeValle had owned Welding and had operated it as a union shop for many years. On July 23, 1968, he entered into a collective bargaining agreement with the Union which was to be effective from 1968 through 1971. The Smiths were employed by DeValle in October 1968. At this time DeValle employed two other men. However, one of them left within a week.

Prior to their employment by DeValle, the Smiths had been union machinists at another company. They did not maintain their union membership after they began working for DeValle. DeValle did not terminate their employment within 30 days as he was required to do by the security clause in the collective bargaining agreement. DeValle stated that normally the Union's business agent would come by the shop periodically to sign up new employees, but that the agent had not come to the shop for six or eight months. DeValle did not pay the Smiths union scale, nor did he contribute to the benefit plans in accordance with the collective bargaining agreement.

The Smiths entered into negotiations with DeValle for a lease of the business. Roy Smith asked DeValle if he had a union contract. DeValle informed him that he had signed an interim agreement but that he could not remember whether he had signed the final collective bargaining agreement. DeValle gave Roy Smith an unsigned copy of the collective bargain-agreement. There was only one copy which was in fact signed and it was in the possession of the Union. Roy Smith testified that as far as he knew it was only a proposed agreement. Roy Smith did not contact the Union in order to ascertain the status of the agreement. However, he did take a copy to an attorney in order to obtain an opinion as to whether a clause pertaining to the obligations of successors upon transfer of the business was binding and enforceable.

The Smiths leased the business from DeValle effective April 1, 1969, with an option to purchase it. At the time the lease was executed it was understood between the parties that Welding was not going to continue as a union shop because it was too expensive to do so. The Smiths did not obtain any uncompleted contracts by virtue of the lease. The actual transfer of possession occurred on March 31, 1969, as DeValle had completed all of his contracts by this date. DeValle retained the outstanding accounts receivable and accounts payable. DeValle comes to the shop in order to pick up his mail and check the old accounts; however, he has no interest in the current business carried on in the shop. The

payments owing to DeValle under the lease are not dependent upon the volume of business.

Following the execution of the lease, the Smiths continued to operate the business in the same location. For the first month they handled all the business themselves. They then hired two new employees. On the average, there have been three or four employees in addition to the Smiths working at Welding. None of the new employees had worked at Welding prior to the lease. Following the lease, most of DeValle's regular customers continued to do business with Welding. The Smiths have also obtained some new customers. During the first year of operation, the Smiths' net profit was between $20,000 and $30,000, but this included the Smiths' wages, and the gross profit was $90,000.[1]

The Smiths are refusing to comply with any of the provisions of the collective bargaining agreement. They told the Union's business agent, "We don't want a union here." None of the new employees at Welding are members of the Union.

### The Wiley Doctrine

Implicit in the Smiths' brief on appeal is the assumption that the trial court relied upon the decision of the United States Supreme Court in *John Wiley & Sons* v. *Livingston,* 376 U.S. 543 [11 L.Ed.2d 898, 84 S.Ct. 909] in reaching its decision. This assumption is warranted by the course of the proceedings below. During the trial the Union sought to introduce the collective bargaining agreement into evidence and the Smiths entered an objection. The Union then made an offer of proof which was premised upon the applicability of *Wiley* to the case before the court. After having read the decision rendered in *Wiley,* the court admitted the collective bargaining agreement into evidence. The Smiths argue that *Wiley* is inapplicable and that under traditional contract principles they have no obligations under the collective bargaining agreement. In the alternative, the Smiths contend that even under the principles set forth in *Wiley* they are not bound by the collective bargaining agreement.

*Wiley* involved a suit by a union under section 301 of the Labor Management Relations Act (29 U.S.C. § 185) to compel arbitration under a collective bargaining agreement. The union and Interscience Publishers, Inc. had entered into a collective bargaining agreement which contained no express provision making it binding upon successors of Interscience. During the term of the agreement, Interscience merged with Wiley and ceased

---

[1]DeValle's annual gross profits prior to leasing the business to the Smiths was $60,000 and his net profit was about $15,000 per year.

doing business as a separate entity. At the time of the merger Interscience had about 80 employees, of whom 40 were represented by the union. It had a single plant in New York City and did an annual business of somewhat over $1,000,000. Wiley was a larger concern, employing about 300 people, and doing an annual business of over $9,000,000. The union contended that despite the merger it continued to represent the covered Interscience employees taken over by Wiley, and that Wiley was obligated to recognize their rights under the collective bargaining agreement. Wiley refused to recognize the union as the bargaining agent or to accede to the union's demands respecting the collective bargaining agreement. The union sued to compel Wiley to arbitrate the dispute in accordance with a provision in the agreement providing for arbitration. (376 U.S. at pp. 544-546 [11 L.Ed.2d at pp. 901-902].)

The high court held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." (376 U.S. at p. 548 [11 L.Ed.2d at p. 904].)

It was recognized that "Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." (376 U.S. at p. 549 [11 L.Ed.2d at p. 904].)

The Supreme Court observed that "While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract. '. . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.' [Citation.]" (376 U.S. at p. 550 [11 L.Ed.2d at pp. 904-905].)

The high court limited its holding by stating that "there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate some-

thing imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved. So too, we do not rule out the possibility that a union might abandon its right to arbitration by failing to make its claims known." (376 U.S. at p. 551 [11 L.Ed.2d at p. 905].)

The principles announced in *Wiley* have been applied to bind purchasers to agreements entered into by their predecessors. (*Wackenhut Corp.* v. *International U., United Plant Guard W.* (9th Cir. 1964) 332 F.2d 954; *United Steelworkers of Amer.* v. *Reliance Univ. Inc.* (3d Cir. 1964) 335 F.2d 891; *United States Gypsum Co.* v. *United Steelworkers of Amer.* (5th Cir. 1967) 384 F.2d 38; *Paud* v. *Alco Plating Corp.*, 21 Cal.App.3d 362 [98 Cal.Rptr. 706].) In *Paud* the crucial question in determining whether the purchaser is to be bound was stated to be whether "there is substantial similarity of operation and continuity of identity of the business enterprise . . . . [Citations.]" (21 Cal.App.3d at pp. 367-368.)

In *NLRB* v. *Burns Security Services*, 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571], the principle declared in *Wiley* was held not to be applicable to a situation where there was no merger, no sale of assets and no dealings whatsoever between the successor employer and its predecessor, and no agreement by the successor to assume a collective bargaining agreement negotiated by the predecessor. In that case a service contract between the predecessor employer and Lockheed Aircraft Service Company had expired and was succeeded to by the successor employer who hired 27 of 42 of the predecessor's security guard employees.

### Applicable Law

■ Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) authorizes labor unions, representing employees in an industry affecting commerce, to maintain suits against employers for violations of collective bargaining agreements. Section 142 of the same act provides that "The term 'industry affecting commerce' means any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce." (29 U.S.C. § 142.) It has been recognized that state courts have concurrent jurisdiction so as to entertain suits brought pursuant to section 301. In adjudicating the merits of the controversy, the state court is obliged to apply federal substantive law. (*Avco Corp.* v. *Aero Lodge 735,* 390 U.S. 557, 559-560 [20 L.Ed.2d 126, 128-130, 88 S.Ct. 1235]; *O'Malley* v. *Wilshire Oil Co.,* 59 Cal.2d 482, 486 [30 Cal.Rptr. 452, 381 P.2d 188];

*San Diego etc. Carpenters* v. *Wood, Wire etc. Union,* 274 Cal.App.2d 683, 686 [79 Cal.Rptr. 164]; *United Concrete Pipe Corp.* v. *Laborers' Local No. 89,* 231 Cal.App.2d 315, 317-318 [41 Cal.Rptr. 816].) However, if the union seeking enforcement of the agreement does not represent employees who are engaged in an industry affecting commerce, the action is not grounded in the federal statutes and the state court is not bound to apply federal substantive law. (*Posner* v. *Grunwald-Marx, Inc.,* 56 Cal.2d 169, 175 [14 Cal.Rptr. 297, 363 P.2d 313]; *O'Malley* v. *Wilshire Oil Co., supra,* at p. 486; *San Diego etc. Carpenters* v. *Wood, Wire etc. Union, supra,* at p. 686.)

If the pleadings do not suggest that the dispute has any relation to interstate commerce, the state court cannot assume that the federal statutes are applicable. (*Chavez* v. *Sargent,* 52 Cal.2d 162, 175 [339 P.2d 801].) Turning to the pleadings in the instant case, it is readily apparent that they contain no suggestion that the instant dispute affects interstate commerce. Moreover, there was no evidence adduced at the trial which indicated such a possibility. There is nothing in the record respecting the nature of Welding's business, the source of its materials, or the destination of its finished products. We therefore conclude that the instant case does not come within the ambit of the federal statutes and we are thus not obligated to follow the principles declared in *Wiley.*

### The Appropriate Rule

The public policy of this state as to labor organizations is stated in Labor Code section 923 as follows: "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore, it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." This policy is applicable to the right of enforcement of collective bargaining contracts. (*Chavez* v. *Sargent, supra,* 52 Cal.2d 162, 191.) The enforcement of such contracts is specifically provided for in Labor Code section 1126 which

provides that "Any collective bargaining agreement between an employer and a labor organization shall be enforceable at law or in equity, and a breach of such collective bargaining agreement by any party thereto shall be subject to the same remedies, including injunctive relief, as are available on other contracts in the courts of this State."

In *Posner* this public policy was analyzed in its relation to federal policy. The Supreme Court, taking cognizance of its declaration in *Chavez* (52 Cal.2d 162, 179-180) that state laws should be interpreted and applied so as to permit, encourage and protect collective bargaining agreements, concluded that "our state policy does not substantially differ from '[t]he present federal policy which is to promote industrial stabilization through the collective bargaining agreement.' (*United Steelworkers* v. *Warrior & Gulf Navigation Co.* . . . 363 U.S. 574, 578.)" (56 Cal.2d at p. 180.)

*Posner,* which was concerned with the proper interpretation to be given to an arbitration clause in a collective bargaining agreement, is similar to the instant case in that the dispute before the court did not involve interstate commerce. In resolving the issue presented the court had to determine whether to adopt as state law a recently announced principle of federal law or another conflicting principle. (56 Cal.2d at pp. 174-175.) The court concluded that the federal rule was most appropriate, and, in adopting it, disapproved a number of Court of Appeal cases which were inconsistent with this conclusion. (At p. 183.)

In reaching its decision, the court in *Posner* set forth a number of policy considerations which favored adoption of the new federal principle. These considerations are relevant to the disposition of the issue presented by the instant case. The court observed that uniformity is to be desired; that the majority of collective bargaining agreements necessarily relate to interstate commerce and so are governed by federal rules; and that most large unions utilize a standard contract which they seek to have signed by various employers whether such employers are engaged in either intrastate or interstate commerce. (56 Cal.2d at p. 176.) The court observed further that the new federal principle was to be preferred because it properly took into consideration the peculiar nature of the collective bargaining agreement, whereas the conflicting principle was based upon strict and technical application of ordinary contract law. (At p. 176.) The court later quoted with approval the following statement made by the United States Supreme Court in *Steelworkers* v. *Warrior & Gulf Co.,* 363 U.S. 574, 578 [4 L.Ed.2d 1409, 1415, 80 S.Ct. 1347], and relied upon by the court in *Wiley*: " 'The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a

myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of the particular industry or of a particular plant.' " (At p. 177.)

*Posner* thus establishes the following principles with respect to the determination of issues which revolve around the interpretation of collective bargaining agreements. First, the policy of this state with respect to the interpretation and enforcement of such agreements is similar to the federal policy. Second, uniformity of decision is desirable in this area of labor relations. Third, collective bargaining agreements are to be distinguished from other types of contracts. In the absence of any countervailing considerations, these principles indicate that the instant case should be resolved by reference to the principles outlined in *Wiley* rather than by application of traditional contract concepts.

The Smiths contend that a contrary conclusion is required by *Gold* v. *Gibbons,* 178 Cal.App.2d 517 [3 Cal.Rptr. 117]. We do not agree. *Gold* involved a suit by a union against the purchaser of a business for damages and an injunction because of the purchaser's failure to abide by a collective bargaining agreement entered into by the union and the seller of the business. (At pp. 518-519.) Although the dispute did not involve interstate commerce, the court recognized that decisions under the federal statutes were often persuasive. However, *Wiley* had not yet been decided and the federal rule at the time was that successors were bound only if the change of ownership was a subterfuge adopted for the purpose of avoiding the collective bargaining agreement. The court concluded in *Gold* that the facts of the case did not bring it within the rule announced in the federal decisions. (At p. 521.) *Gold* thus does not preclude the adoption of federal principles in a case whose facts warrant such a procedure.

Having concluded that the *Wiley* doctrine is applicable to the instant case, we must affirm the judgment if there is substantial evidence of continuity of identity and substantial similarity of operation of the business before and after the lease. (*John Wiley & Sons* v. *Livingston, supra,* 376 U.S. 543, 551 [11 L.Ed.2d 898, 905]; *Paud* v. *Alco Plating Corp., supra,* 21 Cal.App.3d 362, 367-368.) The record discloses that following the execution of the lease, the Smiths continued to operate Welding at its original location. Although the Smiths obtained some new customers, they continued to do work for most of DeValle's old customers. The Smiths eventually employed a few more men than DeValle had employed, but the net profits suggest that the volume of business was not substantially increased. The record thus contains substantial evidence to

support the judgment. We observe, moreover, that the situation held by *Burns Security Services* to be beyond the scope of the *Wiley* doctrine is not present in the instant case. Here we *do* have a transfer of the business from the predecessor employer to the successor employer and dealings between them leading to such transfer.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.