[L.A. No. 30357. In Bank. Oct. 3, 1975.]

GLENDALE CITY EMPLOYEES' ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
CITY OF GLENDALE et al., Defendants and Appellants.

**COUNSEL**

Mohi, Morales & Glasman, Mohi, Morales, Dumas & Glasman and Frank C. Morales for Plaintiffs and Appellants.

Lemaire & Faunce, Cy H. Lemaire, Edward L. Faunce, Davis, Cowell & Bowe, Alan C. Davis and Wayne S. Canterbury as Amici Curiae on behalf of Plaintiffs and Appellants.

Joseph Rainville and Richard W. Marston, City Attorneys, Robert L. Smith, Frank R. Manzano and Peter C. Wright, Assistant City Attorneys, Burke, Williams & Sorensen, George W. Wakefield and Richard R. Terzian for Defendants and Appellants.

David S. Kaplan, Richard S. Whitmore and Gillio & Whitmore as Amici Curiae on behalf of Defendants and Appellants.

**OPINION**

**TOBRINER, J.**—With the enactment of the George Brown Act (Stats. 1961, ch. 1964) in 1961, California became one of the first states to recognize the right of government employees to organize collectively and to confer with management as to the terms and conditions of their employment. Proceeding beyond that act the Meyers-Milias-Brown Act (Stats. 1968, ch. 1390) authorized labor and management representatives not only to confer but to enter into written agreements for presentation to the governing body of a municipal government or other local agency.[1] The present case raises among other issues which we shall discuss the fundamental question unanswered by the literal text of these statutes:

---

[1]The Meyers-Milias-Brown Act (Gov. Code, §§ 3500-3510) applies to employees of municipalities and most other local governmental agencies. Employees of school districts, however, fall under the Winton Act (Ed. Code, §§ 13080-13090) and employees of some transit districts come within the scope of special legislation governing those districts (see, e.g., Pub. Util. Code, §§ 25051-25057). The George Brown Act, now renumbered as Government Code sections 3525-3526, still governs relations between the state and its employees.

whether an agreement entered into under the Meyers-Milias-Brown Act, once approved by the governing board of the local entities, binds the public employer and the public employee organization. We conclude that the Legislature intended that such an understanding, *once ratified*, is indeed binding upon the parties.

1. *Statement of facts.*

Pursuant to the Meyers-Milias-Brown Act, negotiators for plaintiff Glendale City Employees' Association, Inc., the designated representative for the city employees, met with Charles Briley, the assistant city manager, to discuss employee salaries for the 1970-1971 fiscal year. The parties negotiated a memorandum of understanding, which they presented to the city council. On June 9, 1970, the council passed a motion approving the memorandum. The memorandum of understanding provides for a cost of living adjustment, sick leave, incentive pay, and a salary survey; the only matter that remains at issue is the survey provision.[2]

The survey provision reads as follows: "The parties hereto will conduct a joint salary survey and using as guide lines data secured from the following jurisdictions, Burbank, Pasadena, Santa Monica, Long Beach, Anaheim, Santa Ana, Los Angeles City and Los Angeles County. *The intent of the survey will be to place Glendale salaries in an above average position with reference to the jurisdictions compared with proper consideration given to internal alignments and traditional relationships.* The data used will be that data available to us and intended for use in fiscal year 1970-71. Adjustments which it is agreed shall be made will have an effective date of October 1, 1970. It is intended that comparisons will be made on a classification basis and not title only, and that the classifications shall be determined by professional judgment of the highest qualified personnel people with whom we would confer in the jurisdictions with which we will compare."·(Italics added.)

---

[2] The parties also dispute the meaning of language in the preamble to the memorandum respecting the effective date of the understanding. The disputed language states that "The items in this agreement are subject to the approval of the City Manager and the City Council of the City of Glendale, and will be placed into effect upon the taking of administrative action by the City Manager's Office and the adoption of the necessary ordinances and resolutions by the City Council if acceptable to them, in accordance with the terms and conditions hereinafter set forth." Plaintiffs maintained that the understanding became effective upon the council's adoption of a resolution approving the memorandum; defendants argue that it does not take effect until the council adopted ordinances implementing its terms.

Since the city did adopt a salary ordinance with the intent of implementing the memorandum, even under defendants' interpretation the agreement has gone into effect.

The city conducted the survey. Consistent with past practice, the city organized the data by preparing bar graphs comparing Glendale salaries with the surveyed jurisdiction. Although the graphs show the entire salary range for each job classification, the parties are primarily concerned with the salaries paid employees in the top (5th or E) step of each salary range since a majority of Glendale employees are at that level.

By viewing the bar graphs, the city manager could obtain a rough idea of how Glendale salaries at each step compared with salaries paid in surveyed jurisdictions. On this basis the city manager, in September of 1970, prepared a draft salary ordinance. Plaintiff association, using the survey data, computed the arithmetic average of salaries from the surveyed jurisdictions for the top step of each job classification, and discovered that in many instances the salary proposed in the draft ordinance was below this average. Over the objection of the association the city council, on October 1, 1970, enacted the ordinance (Salary Ordinance No. 3936) recommended by the city manager.

On behalf of the class of city employees, plaintiff association and certain of its members filed the instant suit against the City of Glendale and its councilmen. Upholding the binding nature of the memorandum of understanding, the trial court admitted parol testimony of the negotiators to aid in the interpretation of its provisions. On the basis of that testimony, the court concluded that the city must compute the arithmetic (mean) average of the salaries paid employees in the highest step of each comparable classification in the surveyed jurisdictions, and must pay Glendale employees in the fifth step of each classification a salary equal to the average from the surveyed jurisdiction, plus one cent. Salaries of workers in the lower steps would be determined by the existing ratio of such salaries to step E salaries, thus preserving "internal alignments" as required by the memorandum.[3]

The court concluded that Salary Ordinance No. 3936 did not meet these criteria, and that the failure of the city to pay salaries in excess of

---

[3]The trial court also found: (a) that salary data from Los Angeles City and Los Angeles County should be included in computing the average salary, not merely utilized as "reference points" as the city claimed; (b) that the term "traditional relationships" referred to the historical relationship between salaries paid certain Glendale employees and the salaries paid employees of other jurisdictions holding comparable positions; (c) that the term "internal alignments" referred to salary relationships between Glendale employees at different salary steps and classes; (d) that the proviso requiring "proper consideration" for traditional relationships and internal alignments did not authorize the city to rely on such factors to justify payment of below-average salaries.

the arithmetic average of surveyed jurisdictions constituted an abuse of discretion and a breach both of the memorandum of understanding and of the city's duty under the Meyers-Milias-Brown Act. Finally, the court concluded that since plaintiffs had no adequate remedy at law, mandamus should issue to compel defendants to compute and pay compensation to city employees in accord with the formula set out in the court's findings and conclusions. The court directed that 25 percent of all retroactive salaries and wages recovered should be payable to plaintiffs' counsel as attorneys' fees.

Defendants appealed. They contend that the memorandum of understanding was not binding, that the trial court erred in its interpretation of the memorandum, and that in any event the memorandum cannot be enforced by writ of mandamus. Defendants also argue that the present suit is not a proper class action, and that relief is barred by plaintiff's failure to exhaust administrative remedies. Plaintiffs filed a cross-appeal which raises a single limited issue; plaintiffs maintain that whenever an employee's salary must be increased to bring it into line with the survey, it should be increased not only to a figure one cent above average, but to a figure lying on a higher salary range.

2. *The memorandum of understanding, once approved by the city council, is binding upon the parties.*

■ The Meyers-Milias-Brown Act, as set forth in Government Code section 3505.1, provides that after negotiations "If agreement is reached by the representatives of the public agency and a recognized employee organization . . . they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination."[4] As we

---

[4]Section 3500 of the Meyers-Milias-Brown Act does not clearly prescribe whether a local agency may adopt methods of administering employer-employee relations which differ from those prescribed by the act. (See discussion in Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 723-725; Grodin, *California Public Employee Bargaining Revisited: The MMB Act in the Appellate Courts* (1974) Cal. Pub. Employee Relations No. 21, p. 2.) We need not reach that question here, for Glendale has adopted a format for labor-management relations essentially identical to that set out in the Meyers-Milias-Brown Act. The city's employee relation ordinance states that employee organizations shall present written proposals on salaries, fringe benefits, and other conditions of employment to the city manager. It then provides in language parallel to Government Code section 3505.1, that "If agreement is reached by the City Manager and the recognized employee representative, they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to The Council by May 1 of each year." (Ordinance No. 3830, § 11.)

shall explain once the governmental body votes to accept the memorandum, it becomes a binding agreement.

The historical progression in the legislative enactments began with the George Brown Act.[5] That act sought in general to promote "the improvement of personnel management and employer-employee relations . . . through the establishment of uniform and orderly methods of communication between employees and the public agencies by which they are employed." (Stats. 1961, ch. 1964, p. 4141.) It provided, in former section 3505, that "The governing body of a public agency [or its representatives] shall meet and confer with representatives of employee organizations upon request, and shall consider as fully as it deems reasonable such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action." (Stats. 1961, ch. 1964, p. 4142.)[6]

During the years following enactment of the George Brown Act public employee unions continued to grow in size[7] and to press their claims that public employees should enjoy the same bargaining rights as private employees so long as such rights did not conflict with the public service.[8] The George Brown Act, originally a pioneering piece of legislation, provided only that management representatives should listen to and discuss the demands of the unions. Apparently the failure of that act to resolve the continual controversy between the growing public employees' organizations and their employers led to further legislative inquiry. Moreover, subsequent enactments of other states, which granted public employees far more extensive bargaining rights,[9] further exposed the limitations of the George Brown Act.

[5]The George Brown Act originally appeared as Government Code sections 3500-3509. The legislative revisions of 1968 and 1971 reserved those sections for the Meyers-Milias-Brown Act, and reenacted the George Brown Act, now limited to the relationship between the state government and state employees, as Government Code sections 3525-3536.

[6]This provision, reenacted as Government Code section 3530, still governs the relationship between the state and state employees organizations.

[7]See *East Bay Mun. Employees Union* v. *County of Alameda* (1970) 3 Cal.App.3d 578, 583, footnote 7 [83 Cal.Rptr. 503]; Edwards, *The Emerging Duty to Bargain in the Public Sector* (1973) 71 Mich.L.Rev. 885, 886; Werne, *Collective Bargaining in the Public Sector* (1969) 22 Vand.L.Rev. 833.

[8]Anderson, *The Impact of Public Sector Bargaining* (1973) Wis.L.Rev. 986, 988.

[9]See authorities cited footnote 4, *ante.*

Cognizant of this turn of events the Legislature in 1968 enacted the Meyers-Milias-Brown Act.[10] Expressly intending the new law to strengthen employer-employee communication, the Legislature provided for "a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment." (Gov. Code, § 3500.) The public agency must not only listen to presentations, but "meet and confer in good faith" (Gov. Code, § 3505), a phrase statutorily defined to include a free exchange of information, opinions and proposals, with the *objective* of reaching "agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year." *(Ibid.)* Section 3505.1, quoted earlier, provides that if agreement is reached it should be reduced to writing and presented to the governing body of the agency for determination. This statutory structure necessarily implies that an agreement, *once approved by the agency, will be binding.* The very alternative prescribed by the statute—that the memorandum "shall not be binding" except upon presentation "to the governing body or its statutory representative *for determination,*"—manifests that *favorable* "determination" engenders a binding agreement.

Why negotiate an agreement if either party can disregard its provisions? What point would there be in reducing it to writing, if the terms of the contract were of no legal consequence? Why submit the agreement to the governing body for determination, if its approval were without significance? What integrity would be left in government if government itself could attack the integrity of its own agreement? The procedure established by the act would be meaningless if the end-product, a labor-management agreement ratified by the governing body of the agency, were a document that was itself meaningless.

The Legislature designed the act, moreover, for the purpose of resolving labor disputes. (See Gov. Code, § 3500.) But a statute which encouraged the negotiation of agreements, yet permitted the parties to retract their concessions and repudiate their promises whenever they choose, would impede effective bargaining. Any concession by a party from a previously held position would be disastrous to that party if the mutual agreement thereby achieved could be repudiated by the opposing party. Successful bargaining rests upon the sanctity and legal viability of the given word.

---

[10] See California Senate Select Committee on Local Public Safety Employment Practice, To Meet and Confer: A Study of Public Employee Labor Relations (1972) pages 25-26.

In applying the Meyers-Milias-Brown Act, "the courts have uniformly held that a memorandum of understanding, once adopted by the governing body of a public agency, becomes a binding agreement." (Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 756.)[11] The leading decision, however, is one which although decided in 1970 arose under the earlier George Brown Act, *East Bay Mun. Employees Union v. County of Alameda, supra,* 3 Cal.App.3d 578. Settling a strike by county hospital employees, Alameda County agreed to reinstate the strikers without loss of any benefits previously earned by those employees. Upon reinstatement, however, the county classified the strikers as new employees, with resultant loss of seniority, vacation, sick leave, retirement and other benefits.

Reversing a trial court ruling which declined to enforce the agreement, the Court of Appeal through Justice Wakefield Taylor stated that the George Brown Act "required the public agency *to meet and confer and listen* . . . . [T]he modern view of statutory provisions similar to the Brown Act is that when a public employer engages in such meetings with the representatives of the public employee organization, any agreement that the public agency is authorized to make and, in fact, does enter into, should be held valid and binding as to all parties." (3 Cal.App.3d 578, 584.) If, under the more limited provisions of the George Brown Act, which does not specifically refer to an "agreement reached by the representatives of the public agency and a recognized employer organization," nevertheless the negotiation and agreement by such parties are "valid and binding," we conclude a fortiori that the memorandum of

[11]Professor Grodin's article, published in March 1972, cites only superior court decisions in support of his position, but subsequent to that publication two Court of Appeal decisions have also enforced agreements reached under the Meyers-Milias-Brown Act. (*San Joaquin County Employees' Assn., Inc. v. County of San Joaquin* (1974) 39 Cal.App.3d 83, 88-89 [113 Cal.Rptr. 912]; *Wilson v. San Francisco Mun. Ry.* (1973) 29 Cal.App.3d 870 [105 Cal.Rptr. 855].) These decisions, as well as the Court of Appeal opinion in the instant case, are analyzed in a second article by Professor Grodin, *California Public Employees Bargaining Revisited: The MMB Act in the Appellate Courts* (1974) Cal. Pub. Employee Relations No. 21, page 2.

Professor Edwards of the University of Michigan Law School summarized the decisions of other states: "It is increasingly apparent in the developing case law that once a contract has been signed, the public employer must, in effect 'adopt' the contract and do everything reasonably within its power to see that it is carried out." (Edwards, *The Emerging Duty to Bargain in the Public Sector* (1973) 71 Mich.L.Rev. 885, 929.) The phrase "everything reasonably within its power" refers to the problems, discussed by Edwards, which may arise when a public agency agrees to a contract but must depend on appropriations from another agency to carry out that contract. Since the Glendale City Council has authority to appropriate sums needed to pay the salary increase it agreed to pay, those problems do not arise in the present case.

understanding reached under the broader Meyers-Milias-Brown Act is indubitably binding.

3. *The city has failed to comply with the terms of the memorandum of understanding.*

Defendants challenge the trial court's finding that the city did not comply with the terms of the agreement. We have pointed out that the trial judge found the agreement uncertain in meaning and admitted parol evidence to aid in its construction. Defendants do not contend that the evidence received was inadmissible under the parol evidence rule,[12] nor that the evidence so admitted does not support the findings and conclusions of the trial court. Instead, the defendants argue first, that the city singularly enjoys a unilateral right to-insist upon any reasonable interpretation of the agreement that it chooses, and second, that the agreement can properly be interpreted to require only the taking of a salary survey, leaving the fixing of salary ranges to later administrative determination.

The city's claim to a unilateral right to interpret the memorandum rests upon numerous cases holding that a city wage ordinance will not be held to conflict with charter provisions requiring payment of prevailing wages unless the city's action is " 'so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law.' " (*Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252, 261 [90 Cal.Rptr. 169, 475 P.2d 201]; *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 639 [12 Cal.Rptr. 671, 361 P.2d 247]; *City & County of S. F.* v. *Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666].)[13] The city seeks to apply this doctrine to the present case; it argues that in enacting Salary Ordinance No. 3936 it attempted to comply with its duty under the memorandum, and that this ordinance cannot be set aside unless it is fraudulent or palpably unreasonable.

---

[12]See *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 22-23 [92 Cal.Rptr. 704, 480 P.2d 320]; Jones, *Evidentiary Concepts in Labor Arbitration: Some Modern Variations on Ancient Legal Themes* (1966) 13 U.C.L.A. L.Rev. 1241, 1263-1269 fully discusses the effect of the parol evidence rule on the interpretation of collective bargaining agreements.

[13]See also *Alameda County Employees' Assn.* v. *County of Alameda* (1973) 30 Cal.App.3d 518, 532 [106 Cal.Rptr. 441]; *Sanders* v. *City of Los Angeles* (1967) 252 Cal.App.2d 488, 490 [60 Cal.Rptr. 539]; *Anderson* v. *Board of Supervisors* (1964) 229 Cal.App.2d 796, 798-800 [40 Cal.Rptr. 541]; *San Bernardino Fire & Police Protective League* v. *City of San Bernardino* (1962) 199 Cal.App.2d 401, 408 [18 Cal.Rptr. 757].

This argument, however, misses the point; the issue here is not the validity of Ordinance No. 3936, but the sufficiency of that ordinance to fulfill the city's duty under the memorandum. Although the cited cases recognize the broad discretion of a city in interpreting its respective charter's prevailing wage provisions, and although defendant city here would analogize the instant issue with such a prevailing wage case, defendant's position founders on the rock of the *bilateral* nature of the instant memorandum of understanding. We do not probe the city's interpretation and application of a prevailing wage ordinance or even an alleged abuse of discretion by the city in so applying it; we deal here with a mutually agreed covenant, a labor management contract. We know of no case that holds that one party can impose his own interpretation upon a two-party labor-management contract.

In pre-Wagner Act days some courts considered collective bargaining agreements to be merely statements of intention or unilateral memoranda. (See Chamberlain, *Collective Bargaining and the Concept of Contract* (1948) 48 Colum.L.Rev. 829, 832; Annot. (1935) 95 A.L.R. 10, 34-37.) But all modern California decisions treat labor-management agreements whether in public employment[14] or private[15] as enforceable contracts (see Lab. Code, § 1126) which should be interpreted to execute the mutual intent and purpose of the parties.[16]

This principle applies as much to agreements between government employees and their employers as to private collective bargaining

---

[14]See *East Bay Mun. Employees Union v. County of Alameda, supra,* 3 Cal.App.3d 578, 584; *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin, supra,* 39 Cal.App.3d 83, 88-89.

[15]See *Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 177 [14 Cal.Rptr. 297, 363 P.2d 313]; *McCarroll v. L.A. County etc. Carpenters* (1957) 49 Cal.2d 45, 66-67 [315 P.2d 322]; *Holayter v. Smith* (1972) 29 Cal.App.3d 326, 333-334 [104 Cal.Rptr. 745]; *San Diego etc. Carpenters v. Wood, Wire, etc. Union* (1969) 274 Cal.App.2d 683, 689 [79 Cal.Rptr. 164]; *Div. Labor L. Enf. v. Ryan Aero. Co.* (1951) 106 Cal.App.2d Supp. 833 [236 P.2d 236, 30 A.L.R.3d 347].

[16]Civil Code section 1636 declares that "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." This section was applied to the interpretation of private collective bargaining agreements in *General Precision, Inc. v. International Association of Machinists* (1966) 241 Cal.App.2d 744, 746-747 [50 Cal.Rptr. 921] and *McKay v. Coca-Cola Bottling Co.* (1952) 110 Cal.App.2d 672, 676 [243 P.2d 35].

In *Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 177 [14 Cal.Rptr. 297, 363 P.2d 313], we observed that a collective bargaining agreement " 'is more than a contract; it is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate . . . . It calls into being a new common law—the common law of the particular industry.' " (56 Cal.2d 169, 177, quoting *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 578-579 [4 L.Ed.2d 1409, 1415, 80 S.Ct. 1347].)

agreements.[17] Agreements reached under the Meyers-Milias-Brown Act, like their private counterparts, are the product of negotiation and concession; they can serve as effective instruments for the promotion of good labor-management relations only if interpreted and performed in a manner consistent with the objectives and expectations of the parties.

The city raises many other objections to the trial court's interpretation of the agreement: it contends that the memorandum gave the council discretion to choose whether to implement the survey findings; that the memorandum is but an agreement to agree in the future concerning new salary ranges; that the term "average salaries" in the memorandum does not mean an arithmetic average but refers to the city's practice of using bar graphs to visualize an average salary level; that the phrase "proper consideration [for] internal alignments and traditional relationships" in the memorandum authorizes the city to use such alignments and relationships to justify payment of below average salaries.

■ All the above contentions violate the established rule that if the construction of a document turns on the resolution of conflicting extrinsic evidence, the trial court's interpretation will be followed if supported by substantial evidence. (See 6 Witkin, Cal. Procedure (2d ed. 1971) pp. 4248-4249 and cases there cited.) ■ In light of this rule, defendants, in order to overturn the trial court's interpretation, must demonstrate either that the extrinsic evidence on which the court relied conflicts with any interpretation to which the instrument is reasonably susceptible (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 40) or that such evidence does not provide substantial support for the court's interpretation. But defendants present neither contention. Their arguments, based upon an interpretation of the memorandum on its face without reference to the extrinsic evidence or the trial court's findings, pose no issue cognizable within the scope of our appellate review.

4. *Plaintiff union may maintain this action on behalf of the Glendale city employees; allegations that this suit is a class action are superfluous and do not affect the validity of the judgment.*

---

[17]Courts have frequently drawn upon precedents involving private labor-management relations to aid in determining the rights of public employees and employee organizations. (See, e.g., *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 617 [116 Cal.Rptr. 507, 526 P.2d 971]; *Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 341 [113 Cal.Rptr. 461, 521 P.2d 453]; *San Joaquin County Employees' Assn., Inc.* v. *County of San Joaquin, supra,* 39 Cal.App.3d 83, 86.)

■ Plaintiffs' complaint alleges, and the court found, that plaintiffs filed suit on behalf of the class of city employees. Defendants argue that plaintiffs failed to provide adequate notice to the members of the class;[18] plaintiffs respond that defendants first raised this issue on appeal. Plaintiffs' class allegations, however, are superfluous; plaintiff association, as the recognized representative of city employees, may sue in its own name to enforce the memorandum of understanding. (See *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 283-284 [32 Cal.Rptr. 830, 384 P.2d 158].) Since the class action format adds nothing to the rights or liabilities of the parties,[19] the issue of notice to the members of the class is immaterial.

The instant case in this respect closely resembles *Daniels* v. *Sanitarium Assn., Inc.* (1963) 59 Cal.2d 602 [30 Cal.Rptr. 828, 381 P.2d 652], in which we first confirmed the right of a union to sue as a legal entity. In *Daniels,* the union vice-president sued as a "representative" of the union; we held that the suit should have been filed by the union directly. We stated, however, that "[w]e do not believe the form in which the action is brought should be crucial. Here Daniels sued 'in a representative capacity for and on behalf of' the union . . . . But the union, as we have pointed out, may sue as an entity for the wrong done to itself; such an action is not a class action but a direct one by the union. Hence the better and simplest form of procedure would be the suit in the name of the union as such. Since the matter is procedural only, however, we have considered, and sustained, the instant complaint as one brought by the union as an entity." (59 Cal.2d at pp. 608-609.)

In accord with *Daniels,* we conclude that the unnecessary allegations and findings that the suit is a class action do not detract from the merits

---

[18]The record indicates only that plaintiff union posted notice of the action on various bulletin boards. After the court found in favor of plaintiffs, the union posted a second notice advising employees that their counsel would request an award of attorneys' fees, and the manner in which employees could appear in order to be heard in opposition to that award.

[19]It is not necessary to find this suit a proper class action in order to uphold the portion of the judgment awarding counsel for plaintiffs 25 percent of all retroactive salaries and wages received. That award may be sustained under the rule that a litigant who creates a fund in which others enjoy beneficial rights may require those beneficiaries to pay their fair share of the expense of litigation. (See *Sprague* v. *Ticonic Bank* (1939) 307 U.S. 161 [83 L.Ed. 1184, 59 S.Ct. 777]; *Estate of Stauffer* (1959) 53 Cal.2d 124, 132 [346 P.2d 748]; *Estate of Reade* (1948) 31 Cal.2d 669, 671-672 [191 P.2d 745]; *Winslow* v. *Harold G. Ferguson Corp.* (1944) 25 Cal.2d 274, 277 [153 P.2d 714]; *Farmers etc. Nat. Bank* v. *Peterson* (1936) 5 Cal.2d 601, 607 [55 P.2d 867]; Dawson, *Lawyers and Involuntary Clients: Attorneys Fees From Funds* (1974) 87 Harv.L.Rev. 1597.)

of plaintiff association's suit as the recognized representative of the city employees. "Superfluity does not vitiate." (Civ. Code, § 3537.)

5. *Plaintiffs' action is not barred for failure to exhaust administrative remedies.*

■ Defendants contend that this suit is barred by plaintiffs' failure to exhaust administrative remedies. Defendants refer to the grievance procedure established by Ordinance No. 3830, enacted in 1968. Section 9 of this ordinance provides that an aggrieved employee, whose dispute relates to "the interpretation or application of this Ordinance, an ordinance resulting from a memorandum of understanding, or of rules or regulations governing personnel practices or working conditions" should first consult informally with his supervisor. If that consultation does not resolve the dispute, the employee may file a grievance form with the supervisor, who must enter his decision and reasons and return the form to the employee. If dissatisfied with the supervisor's response, the employee may forward the form to the division head; if dissatisfied with the division head's response, he may forward the form to the city manager, whose decision is final. Plaintiffs did not follow this procedure before instituting the present action.

The requirement of exhaustion of administrative remedies does not apply if the remedy is inadequate. (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761]; *Diaz* v. *Quitoriano* (1969) 268 Cal.App.2d 807, 812 [74 Cal.Rptr. 358]; Comment, *Exhaustion of Administrative Remedies in California* (1968) 56 Cal.L.Rev. 1061, 1079-1080.) The city's grievance procedure is inadequate to the resolution of the present controversy in two respects.

First, the pertinent portion of Ordinance No. 3830 provides only for settlement of disputes relating to the "interpretation or application of . . . *an ordinance resulting* from a memorandum of understanding." (Italics added.) The crucial threshold issue in the present controversy—whether the ratified memorandum of understanding *itself* is binding upon the parties—does not involve an "ordinance" and hence does not fall within the scope of grievance resolution.

Second, the city's procedure is tailored for the settlement of minor *individual* grievances. A procedure which provides merely for the submission of a grievance form, without the taking of testimony, the submission of legal briefs, or resolution by an impartial finder of fact is

manifestly inadequate to handle disputes of the crucial and complex nature of the instant case, which turns on the effect of the underlying memorandum of understanding itself. (Cf. *Martino* v. *Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 57 [43 Cal.Rptr. 255].)

## 6. *Mandamus lies to enforce the memorandum of understanding.*

■ The usual remedy for failure of an employer to pay wages owing to an employee is an action for breach of contract; if that remedy is adequate, mandate will not lie. (See *Elevator Operators etc. Union* v. *Newman* (1947) 30 Cal.2d 799, 808 [186 P.2d 1] and cases there cited.) But often the payment of the wages of a *public* employee requires certain preliminary steps by public officials; in such instances, the action in contract is inadequate and mandate is the appropriate remedy. (See *Tevis* v. *City & County of San Francisco* (1954) 43 Cal.2d 190 [272 P.2d 757] (mandate to compel officials to approve payroll); *Ross* v. *Board of Education* (1912) 18 Cal.App. 222 [122 P. 967] (mandate to compel officials to approve payment); cf. *Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199 [37 Cal.Rptr. 425, 390 P.2d 193] (mandate to compel controller to certify that funds have been appropriated).) The superior court in the present case concluded that since "enforcement of the rights of [plaintiffs] requires obtaining the official cooperation necessary to implement the application of the formula agreed upon in the Memorandum of Understanding. . . . [Plaintiffs] do not have a speedy or adequate remedy at law to prevent the deprivation of their rights other than by mandamus."[20]

Although defendants do not challenge the court's conclusion that plaintiffs have no other adequate remedy, they nonetheless urge that the remedy of mandamus is not available. Defendants contend that the adoption of a salary ordinance constitutes a legislative act within the discretion of the city council, and that mandamus will not issue to compel action lying within the scope of agency or official discretion, or to compel performance of a legislative act.[21]

---

[20]Plaintiffs also sought declaratory relief, and undoubtedly established a controversy sufficient to justify that remedy. (See *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 636-637 [12 Cal.Rptr. 671, 361 P.2d 247]; *San Bernardino Fire & Police Protective League* v. *City of San Bernardino, supra,* 199 Cal.App.2d 401, 417.) The fact, however, "that an action in declaratory relief lies . . . does not prevent the use of mandate." (*Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 603 [241 P.2d 283].)

[21]See 5 Witkin, California Procedure (2d ed. 1971) page 3851 and cases there cited.

Defendants' contention rests upon the mistaken impression that the trial court mandated the enactment of a new salary ordinance. The trial court's judgment, however, proceeded upon the theory that the council's approval of the memorandum of understanding in itself constituted the legislative act that fixed employee salaries in accord with that understanding. The writ, therefore, did not command the enactment of a new salary ordinance, but directed the non-legislative and ministerial acts of computing and paying the salaries as fixed by the memorandum and judgment.[22] The use of mandamus in the present case thus falls within the established principle that mandamus may issue to compel the performance of a ministerial duty[23] or to correct an abuse of discretion.[24]

■ "The critical question in determining if an act required by law is ministerial in character is whether it involves the exercise of judgment and discretion." *(Jenkins v. Knight* (1956) 46 Cal.2d 220, 223-224 [293 P.2d 6].) ■ In the present case, the city entered into an understanding which, we have held, became a valid and binding agreement upon approval by resolution of the council. That agreement, as interpreted by the trial court, is definitive, and admits of no discretion.

The findings and judgment establish precise mathematical standards which, applied to the survey data, yield the exact sums due. The trial court, in fact, awarded plaintiffs prejudgment interest on the ground that

[22]Part 1 of the trial court judgment provides "That a peremptory writ of mandate issues directing the respondents . . . to proceed at once to provide salary and wage increases . . . in accordance with the following standard: . . ." The judgment then sets out in detail the formula by which the wage increase for each step of each job classification must be computed. Part 2 of the judgment then provides that "When the foregoing computations have been made, respondents are further directed to proceed at once to pay the differential sum due each said employee for the period October 1, 1970 through June 30, 1971, together with interest as provided by law . . . ."

[23]See *People* ex rel. *Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193]; *Jenkins v. Knight* (1956) 46 Cal.2d 220 [293 P.2d 6]; California Civil Writs (Cont.Ed.Bar 1970) sections 5.25-5.26.

[24]"While mandamus will not lie to control the discretion exercised by a public officer or board . . . it will lie to correct an abuse of discretion by such officer or board." *(Baldwin-Lima-Hamilton Corp. v. Superior Court* (1962) 208 Cal.App.2d 803, 823 [25 Cal.Rptr. 798]; see *Walker v. County of Los Angeles, supra,* 55 Cal.2d 626, 639; Cal. Civil Writs (Cont.Ed.Bar 1970) §§ 5.33-5.35; 5 Witkin, Cal. Procedure (2d ed. 1971) pp. 3853-3854.) Contrary to the claim of the concurring and dissenting opinion (see *infra* at pp. 347, 348), appellate courts in this state have on numerous occasions mandated legislative bodies to enact salary ordinances. (See, e.g., *Sanders v. City of Los Angeles* (1970) 3 Cal.3d 252, 262 [90 Cal.Rptr. 169, 475 P.2d 201]; *Walker v. County of Los Angeles* (1961) 55 Cal.2d 626, 639 [12 Cal.Rptr. 671, 361 P.2d 247]; *Sanders v. City of Los Angeles* (1967) 252 Cal.App. 2d 488 [60 Cal.Rptr. 539]; accord *Griffin v. Board of Supervisors* (1963) 60 Cal.2d 318 [33 Cal.Rptr. 101, 384 P.2d 421] (mandate directing board of supervisors to reapportion county).)

the action was one "to enforce an underlying monetary obligation *the amount of which was certain or could have been made certain by calculation.*" (Italics added.) Unquestionably the *negotiation* and *approval* of the understanding involved the exercise of discretion by city officials. (*San Joaquin County Employees' Assn., Inc.* v. *County of San Joaquin, supra,* 39 Cal.App.3d 83, 87-88.) But in approving the understanding, the city exhausted that discretion; the duty of its officials to carry out its obligations is of ministerial character.

7. *The cause must be remanded for joinder of the city officers charged with the duty of computing and paying wages and salaries of city employees.*

As we have noted, the trial court mandated performance of the ministerial acts of computing and paying the salaries as fixed by the judgment. The court's writ, however, was directed only to the city and its councilmen; plaintiffs failed to join as additional defendants the city officials entrusted with the administrative duties of computing and paying salaries. The trial court judgment and mandate thus suffer from a procedural defect similar to that discussed by the Court of Appeal in *Martin* v. *County of Contra Costa* (1970) 8 Cal.App.3d 856 [87 Cal.Rptr. 886].

In *Martin,* plaintiffs sued the county and its board of supervisors to mandate payment of uniform allowances. The trial court rendered judgment only against those named defendants, and not against the county officers responsible for payment of the allowances. In remanding the cause for further proceedings, the Court of Appeal stated that "The only defect in proceedings and judgment is the failure to join the proper ministerial officers of the county government. Plaintiffs should be permitted to join the proper parties . . . . Since the county is the real party in interest and has been represented throughout, those ministerial officers should not be permitted to assert any laches or limitations upon being joined, but should be bound by the findings made against the county and its board of supervisors which have been approved in this opinion." (8 Cal.App.3d at p. 866.)

Following the reasoning of the Court of Appeal, we hold that the present judgment in favor of plaintiffs must be reversed and remanded to permit joinder of the appropriate city officials. These ministerial officers should not be permitted to assert any defense of laches or

limitations, and will be bound by the findings of the trial court made against the city.

8. *Plaintiffs' cross-appeal is not meritorious.*

The City of Glendale has traditionally determined employee salaries by establishing a five-step salary range for each job classification. The trial court directed that whenever Glendale's salary for the fifth step of a salary range was less than the average salary from the surveyed jurisdictions, the city must raise the fifth step salary to an amount equal to that average plus one cent; it further directed that salaries for steps one through four be raised proportionately to the fifth step salary.

Plaintiffs argue on their cross-appeal that the trial court, instead of directing payment of fifth step salaries equal to the survey average plus one cent, should have ordered the city to provide salary increases to the closest fifth step of a higher range above the average. We believe, however, that the court did exactly that which plaintiffs now request; in fixing step five salaries at the average plus one cent, and increasing step one through four salaries proportionately, the court in effect established a new salary range at a level sufficient to assure plaintiffs a salary above the average from the surveyed jurisdiction. Although plaintiffs would prefer a raise to a salary range which exceeded that average by more than the one cent differential established by the trial court, they point to nothing in the memorandum of understanding or the evidence which bars the creation of new salary ranges so long as they yield an above-average wage.

9. *Conclusion*

For the foregoing reasons, the judgment is reversed, and the cause remanded for further proceedings in accord with the views expressed in this opinion. Each side shall bear its own costs on appeal.

Wright, C. J., McComb, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

**MOSK, J.**—I concur in the reversal of the judgment, but I dissent from the directions given upon remand.

The majority make out a persuasive case for finding that a memorandum of understanding regarding municipal employee salaries was

reached and that the city should in good conscience honor its agreement. From that moral reading, however, the majority leap to a legal conclusion which results in judicial invasion of the legislative process, and the matter is returned to the trial court for issuance of an order which cannot, or should not, be enforced.

The posture in which this case comes to us is of significance. First of all, the plaintiffs sued no ministerial officers; they sued the City of Glendale and five individuals identified as "the duly elected councilmen," members of the "governing body" of the City of Glendale. No other persons, particularly none with ministerial as distinguished from legislative duties, appeared in the action at any time.

Secondly, the trial court issued a writ of mandate "directing the respondents and each of them [i.e., the city and the duly elected councilmen] to proceed at once to provide salary and wage increases to petitioners . . . ."

And finally, in their petition for hearing the petitioners seek mandate to enforce a memorandum "executed by the City of Glendale," not mere performance of a duty by an identified ministerial public servant.

# I

The majority have cited no authoritative cases in which a city and its legislative body have been mandated to adopt an ordinance, relating to salaries or to any other subject. The reason there are no such appellate cases is elementary: adoption or rejection of an ordinance has always been recognized as an act of legislative discretion and courts may not interfere with that legislative function. Each councilman has his electorally bestowed right to vote "aye" or "nay" on any proposal pending before the body. Perhaps, as here, the city and its governing legislators should have honored an obligation, but they cannot be compelled to do so by mandate of a court.

Let us review the cases cited by the majority to purportedly support their conclusion that a city and its councilmen may be ordered to enact a specified ordinance. In *Tevis v. City and County of San Francisco* (1954) 43 Cal.2d 190, 194 [272 P.2d 757], members of a commission, the secretary of the civil service commission and the controller "were directed to certify and approve payrolls." This was clearly a ministerial act, but, the court continued at page 200, city officials "may not be

compelled to authorize the payment of compensation or issue a warrant when funds are lacking [i.e., unappropriated]." This court expressed the hope the city would make funds available, but there was no order for it to do so. *Ross* v. *Board of Education* (1912) 18 Cal.App. 222 [122 P. 967], involved an order directing members of a board to pay $100 due on an employment contract.

*Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199 [37 Cal.Rptr. 425, 390 P.2d 193], concerned mandate against the city controller because he had failed to perform what the court found to be a ministerial duty (*id.* at p. 204). To the same effect is *San Francisco* v. *Boyd* (1941) 17 Cal.2d 606 [110 P.2d 1036]; involving an employment contract, the mandate suit was not directed to the city or its legislative body, but against the controller, a ministerial officer. Similarly in *Ackerman* v. *Moody* (1918) 38 Cal.App. 461 [176 P. 696], the city auditor, not the City of San Diego or its council, was ordered by mandate to certify a recall election.

The majority, in footnote 24, desperately attempt to find some authority for courts to mandate legislative bodies. They miss the target. *Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252 [90 Cal.Rptr. 169, 475 P.2d 201], and *Sanders* v. *City of Los Angeles* (1967) 252 Cal.App.2d 488 [60 Cal.Rptr. 539], arose out of the same circumstances. The courts found that a ministerial officer had failed to perform his charter-required function. "As the adviser of the committees and the council and as the responsible official of the city, the City Administrative Officer failed utterly to perform his duties." (*Id.* at p. 493 of 252 Cal.App.2d.) He, and several administrative departments—recreation and parks, library, retirement system, pensions—were then directed to perform their ministerial duties.

In *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 632 [12 Cal.Rptr. 671], the court declared that the board of supervisors failed to perform its duty, but found only that the board has "a quasi-judicial, *non-legislative*, fact-finding function *preceding* the performance of the indicated legislative act." (Italics added.) It was that nonlegislative function the board was mandated to perform.

It is true that we ordered the board of supervisors to redistrict supervisorial districts in *Griffin* v. *Board of Supervisors* (1963) 60 Cal.2d 318 [33 Cal.Rptr. 101, 384 P.2d 421]. I point out, however, that this court obviously has had second thoughts about the propriety of such an order,

for it was not repeated in subsequent reapportionment cases. We never again mandated a legislative body to pass a reapportionment act; we indicated that if it did not do so by a specified time, the court would undertake the task. And we did. (*Silver* v. *Brown* (1965) 63 Cal.2d 270, 281 [46 Cal.Rptr. 308, 405 P.2d 132]; *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 603 [99 Cal.Rptr. 481, 492 P.2d 385]; *Legislature* v. *Reinecke* (1972) 7 Cal.3d 92, 93 [101 Cal.Rptr. 552, 496 P.2d 464]; *Legislature* v. *Reinecke* (1973) 10 Cal.3d 396 [110 Cal.Rptr. 718, 516 P.2d 6].)

Thus it is abundantly clear that appellate courts do not order a political subdivision as an entity, or its legislative body, to act or to refrain from acting in any specified manner.

*Tandy* v. *City of Oakland* (1962) 208 Cal.App.2d 609 [25 Cal.Rptr. 429], is a case in point. Plaintiffs sought to mandate the city council to rezone their property on a theory that the current zoning ordinances were unconstitutional as applied. The court held that such ordinances "are entirely within the discretion of the municipal legislative body" and that "a court cannot substitute its judgment for that of the municipality" (*id.* at p. 612). To the identical effect is *Johanson* v. *City Council* (1963) 222 Cal.App.2d 68, 72 [34 Cal.Rptr. 798].

## II

The majority seem to assume that a mere ministerial act, performed by unidentified "appropriate city officials" (*ante*, p. 346), will provide the petitioners with the remedy they seek. The assumption is unjustified.

As alleged in the complaint and as found by the trial judge, on September 29, 1970, the city council adopted salary ordinance No. 3921, which, said the trial court, "did not provide increases in salaries and wages" based upon the purported formula. The adoption of that ordinance was clearly a legislative act, as, indeed, is the passage or rejection of any ordinance. If there are to be any other or different salary provisions, ordinance No. 3921 must be repealed by the city council and another ordinance adopted in its stead. Such action will also be strictly legislative in character.

That brings us back to square one: there is no authority for this court, or any court, to direct how the city councilmen, individually or collectively, are to vote on any measure proposed to repeal ordinance No. 3921. Pursuant to a bargained understanding, the councilmen may

be under a moral obligation to adopt a new salary ordinance. However, the question before us is not the existence of a prior commitment, but whether a court may compel a legislative result.

The procedure employed by the Court of Appeal in *Martin* v. *County of Contra Costa* (1970) 8 Cal.App.3d 856 [87 Cal.Rptr. 886], and adopted by the majority here, is untenable. The court there conceded "the general principle that the courts have no power to compel the performance of a legislative act" and that the petitioners asked for mandate to compel the city "to enact a county ordinance which compensates and provides benefits for petitioners" (*id.* at p. 865). It then proceeded to direct joinder of ministerial officers. How, it must be asked, can the ministerial officers secure enactment of a county ordinance as prayed? The *Martin* court gives us no clue, nor do the majority advise us here how the unidentified ministerial officers, at this late date to be amended into the case, are to undertake the legislative task of repealing ordinance No. 3921 and adopting another measure in its place.

III

Finally, I am compelled to make an embarrassing inquiry. How do my learned colleagues propose to enforce their order?

Naturally it is to be hoped that all good citizens will accept a final judicial determination of their rights and duties. But let us assume arguendo that the Glendale City Councilmen are intransigent, that they steadfastly refuse to vote to repeal ordinance No. 3921 and to adopt another salary ordinance in its stead. Are my colleagues prepared to cite the entire legislative body for contempt of their order? (See, e.g., *City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 519-520 [241 P.2d 243].) I would hope not. Yet the potential need to do so demonstrates one of the pitfalls when the judiciary attempts in any manner to dictate how the legislative process is to function.

In the final analysis, this is not a labor or salary case nor is it litigation over a contract. This is purely and simply an issue of separation of powers. I, for one, am unwilling to embark upon a murky project of ordering legislative members to adopt an ordinance, no matter how desirable I may believe the ordinance to be.

The petition of defendants and appellants for a rehearing was denied October 30, 1975. Mosk, J., was of the opinion that the petition should be granted.