[Civ. No. 30631. First Dist., Div. Four. Jan. 9, 1973.]

JOSEPH A. WILSON, Plaintiff and Appellant, v.
SAN FRANCISCO MUNICIPAL RAILWAY et al.,
Defendants and Respondents;
TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO et al.,
Interveners and Respondents.

## COUNSEL

Patricia D. Lee, Michael Miller, Donald R. Prigo and David McClain for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, McMorris M. Dow, Deputy City Attorney, and William F. Bourne for Defendants and Respondents.

Darwin & Riordan and John Riordan for Interveners and Respondents.

## OPINION

**RATTIGAN, J.**—Joseph A. Wilson appeals from a judgment denying his petition for a writ of mandate which would have required that a specified administrative hearing, to be conducted in connection with his prospective dismissal from municipal employment, be opened to the public.

Although the facts are essentially undisputed and might be briefly stated of themselves, they have occurred within an elaborate context of municipal charter provisions and other documentary materials. The following detailed recital is therefore required:

Appellant is employed by the City and County of San Francisco, a chartered city and county (hereinafter "the City"), as a bus driver in its Municipal Railway system. That system is part of the public utilities complex which the City operates under the general management of its five-member public utilities commission, pursuant to provisions of the City's charter which are addressed to public utilities as such. The powers of the public utilities commission do not include its functioning in the dismissal of a permanent employee; under the civil service provisions of the charter, "the manager of utilities" alone may dismiss such employee, and only for cause, after a public hearing, and subject to appeal by the affected employee to the City's civil service commission.[1]

---

[1] The applicable provisions of the charter have been cited on the appeal as they were numbered prior to December 1971. The entire charter has subsequently been recodified, with new article, chapter and section numbers but without substantive change. (Stats. 1971, Res. ch. 273, p. 4538 et seq. See, particularly, *id.*, § 11.104, p. 4864.) We herein cite each of its relevant provisions by its new number.

The identity and functions of the public utilities commission and of the "manager of utilities," and the commission's general jurisdiction, are spelled out in charter sections 3.590, 3.591 and 3.593, all of which appear in Article III of the charter ("The Executive Branch") under "Part Ten: Public Utilities Commission."

As pertinent here, section 3.593 provides: "Manager of Utilities . . . The public

Appellant is a "permanent" employee of the City within the meaning of charter section 8.341. (See fn. 1, *ante.*) He is also a member of Local Union 250A (hereinafter the "local union") of the Transport Workers of America, AFL-CIO (the "international union"). In December 1968, the two unions and the City's public utilities commission entered into a "Memorandum of Agreement" which pertained, generally, to the working conditions of union members employed by the City in its Municipal Railway system.[2] Among other things, the 1968 agreement provides, in article II thereof, that "[t]he terms and conditions of employment . . . [of such persons] . . . shall be governed by the terms and conditions established by [the City's] charter provisions, ordinances by the [City's] Board of Super-

utilities commission shall appoint a manager of utilities who shall be the chief executive of the commission . . ."

Section 3.501 of the charter appears under Chapter Five ("Administrative Departments, Boards and Commissions") and reads: ".. . [T]he . . . chief executive appointed by each . . . commission . . . shall act as the 'appointing officer' under the civil service provisions of this charter for the appointing, disciplining and removal of such . . . employees as may be authorized."

The "civil service provisions" of the charter appear in Chapter Three ("Civil Service Provisions") of Article VIII thereof ("The Rights and Obligations of Officers and Employees"). Within Part Four ("Suspension and Dismissal") of Chapter Three, section 8.341 provides in pertinent part: "Dismissal for Cause. No person employed under the civil service provisions of this charter . . . shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. . . . When charges are made, the appointing officer shall, in writing, notify the person accused of the time and place when the charges will be heard . . . The appointing officer shall publicly hear and determine the charges, and may exonerate, suspend or dismiss the accused. . . . The finding of the appointing officer shall be final, unless within thirty days therefrom the dismissed employee appeals to the [City's] civil service commission. . . . The civil service commission shall examine into the case and . . . may . . . make such decision as it deems just. . . ."

[2] According to inferences which may reasonably be drawn from the record on appeal, and to a statement in appellant's opening brief (neither of which sources has been controverted in this court), the 1968 agreement was executed pursuant to state law (see Gov. Code, §§ 3500, 3501, 3505.1), and after the City's electors had amended its charter to enable such agreements and the City's board of supervisors had authorized its public utilities commission to enter into this agreement with the unions.

The 1968 agreement was apparently received in evidence herein by incorporation in a memorandum of points and authorities submitted by appellant in support of his petition for a writ of mandate. Various declarations referring to the agreement were also filed; as will appear, the trial court took the entire cause under submission upon such declarations, and briefs by the parties, without hearing trial evidence as such. Insofar as they pertain to the 1968 agreement, the declarations mentioned are argumentative and conclusionary, rather than factual; none of them may be deemed to have constituted extrinsic evidence admitted in aid of the agreement's interpretation. We are therefore free to interpret the agreement independently. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Silva & Hill Constr. Co.* v. *Employers Mut. Liab. Ins. Co.* (1971) 19 Cal.App.3d 914, 921 [97 Cal.Rptr. 498].)

visors, relevant rules of the [City's] Civil Service Commission and by the terms and conditions of employment set forth in this agreement."

Article XVI of the agreement establishes a four-step "grievance procedure" which may be invoked by a Municipal Railway employee who is faced with dismissal or other disciplinary action. The provisions referable to "Step 1" permit him to present a "grievance," having to do with "proposed disciplinary action" affecting him, to his "Division Superintendent" for "decision" by the latter. "Step 2" of the procedure permits the employee to appeal from that decision to a higher officer in the Municipal Railway system (the "Transportation Superintendent"). The "Step 3" provisions permit the employee to appeal, still further, to the "General Manager of the [Municipal] Railway," and require a hearing before him, or his nominee, and a written decision by the Step 3 hearing officer. When "disciplinary dismissal" of the employee has been proposed in charges preferred against him, the grievance procedure is initiated at "Step 3."[3]

The "Step 4" provisions of the grievance procedure are not involved in the present case (because, as will appear, appellant has not completed Step 3 of the grievance procedure). They permit an employee to appeal from the Step 3 decision to an "impartial hearing officer" who is chosen by agreement or by arbitration, and require a de novo hearing before that officer and a written report (including a "recommended decision") by him to the "General Manager of Public Utilities." They further provide that the latter "shall exercise his discretion in accepting, modifying or rejecting the recommended decision." The person to whom the 1968 agreement refers as the "General Manager of Public Utilities" is the "manager of utilities" who alone, as "appointing officer," has the power to dismiss permanent Municipal Railway employees under the City's charter. (See fn. 1, *ante.*) The Step 4 provisions of the agreement apparently require him to consider the recommendation of the "impartial hearing officer" in exercising this power after a final—and public—hearing conducted by himself pursuant to the charter (*ibid.*), but do not limit the discretion with which

---

[3]In these respects, the pertinent provisions of the 1968 agreement read as follows:

"*Step 3:* At any time within five (5) days after the Step 2 decision, the grievantor the Union may appeal in writing therefrom to the General Manager of the [Municipal] Railway. The said General Manager or his duly designated representative shall conduct a hearing on the grievance within five (5) days after receipt of the appeal, and the grievant and the Union shall be given notice thereof and an opportunity to be heard. Within seven (7) days after the close of the hearing, the said General Manager shall file his written decision and deliver a copy thereof to the grievant and to the Union.

"Where the grievance is directed against [*sic*] a proposed disciplinary dismissal. the grievance shall be initiated at Step 3 . . . ."

the charter vests him relative to dismissal of Municipal Railway employees. (*Ibid.*)

The agreement provides for appropriate notices to "the Union" (a collective term which includes both the local and international unions), and for active union participation at each "step" of the grievance procedure. In further deference to the City's charter, the agreement also states that "[n]othing contained in this [grievance] procedure shall be construed to deny to any employee his rights under the law or under applicable civil service rules, regulations and practices, or to diminish the powers and duties of the General Manager of Public Utilities, as prescribed in the Charter of the City and County of San Francisco."

The present controversy commenced when John M. Woods, general manager of the Municipal Railway, notified appellant by letter that he (Woods) had "preferred charges" against appellant, directed to the latter's dismissal from employment for "serious willful abuse of San Francisco Municipal Railway equipment." Woods' letter, which was dated November 20, 1970, stated that the charges had been preferred pursuant to specified provisions of the 1968 agreement. Appellant thereupon invoked the "grievance procedure" authorized by the agreement, which procedure entitled him to a "Step 3 hearing," in the first instance, before Woods or the latter's "duly designated representative." (See text at fn. 3, *ante*.) Woods appointed respondent James J. Finn as his "representative" to conduct the Step 3 hearing. (*Ibid.*) Appellant demanded of Finn that the hearing be opened to the public; the unions did not join in the demand, but opposed it. Finn having refused the demand, appellant commenced the present mandamus action to compel an open Step 3 hearing.

Appellant alleged the substance of the foregoing facts in his petition for writ of mandate, in which he named as respondents only Finn (by name and title) and "SAN FRANCISCO MUNICIPAL RAILWAY, division of the Public Utilities Commission." Respondent Finn alone answered appellant's petition in the first instance. The local and international unions, having been granted leave to intervene, also answered the petition in opposition thereto, and appear as respondents on the appeal.

Several declarations and briefs were filed in the trial court upon behalf of appellant, respondent Finn, and the intervening unions. When the cause came on for trial, no evidence was presented; the trial court took the cause under submission upon the pleadings, briefs and declarations. The court

made appropriate findings of fact, from which it drew pertinent conclusions of law, and ordered, as follows:

"1. The said [1968] Memorandum of Agreement does not require that hearings under said grievance procedure be open to the public. 2. The hearing under said grievance procedure is not a dismissal hearing. 3. The purpose of the said grievance procedure is to determine whether or not the officer hearing the grievance should recommend that dismissal or disciplinary procedure be invoked. 4. The Ralph M. Brown Act (Government Code Sec. 54950, et seq.) does not require that hearings under the said grievance procedure be public hearings. 5. The denial of a public hearing under said grievance procedure does not deprive Petitioner Wilson [appellant] of due process of law. . . . Let judgment be entered accordingly."

Appealing from the judgment entered as ordered, appellant challenges the trial court's conclusions of law. Specifically, he contends (1) that, contrary to conclusion of Law No. 4, a public Step 3 hearing is required by the Ralph M. Brown Act;[4] (2) that, contrary to No. 1 (and collaterally to Nos. 2 and 3), a public hearing is required by the 1968 agreement; and (3) that, contrary to No. 5, denial of a public hearing at the Step 3 level operates to deny him due process of law. All his contentions must be rejected; we affirm the judgment.

### The Brown Act Does Not Require a Public Step 3 Hearing

The only provision of the Brown Act actually requiring that governmental proceedings be opened to the public is section 54953, which commands that result only as to "meetings" of a "legislative body of a local agency."[5] Appellant contends in substance that the Step 3 hearing is subject to the same mandate (1) because the hearing officer constitutes a "legislative body" of a local agency as the quoted term is defined in the Act, and (2) because the hearing itself is a "meeting" within the meaning thereof. We hold to the contrary in each respect.

In this regard, the relevant provisions of the Brown Act are sections

[4]The Ralph M. Brown Act appears in the Government Code (commencing with § 54950) under title 5 (Local Agencies), division 2 (Cities, Counties and Other Agencies), part 1 (Powers and Duties Common to Cities, Counties and Other Agencies), as chapter 9 (Meeting) of part 1. We hereinafter refer to it as the "Brown Act" (or as the "Act"), and all statutory references are to the Government Code except where otherwise expressly indicated.

[5]"54953. All *meetings* of the *legislative body* of a local *agency* shall be open and public, and all persons shall be permitted to attend any *meeting* of the *legislative body* of a local agency, except as otherwise provided in [the Brown Act]." (Italics added.)

54951 (which defines "local agency")[6] and sections 54952, 54952.3, and 54952.5 (each of which defines "legislative body").[7] Because it is a "city and county," the City is a "local agency" within the section 54951 definition, and its public utilities commission meets the same definition because it is a "commission" of the City under the latter's charter. (See the charter sections cited in the second paragraph of fn. 1, *ante*.) The Step 3 hearing officer acts for the City to the extent that the hearing pertains to municipal personnel, for the commission to the extent that the Municipal Railway system is within the commission's general field of interest (*ibid.*), and for both because he (the Step 3 hearing officer) functions pursuant to a contract authorized by the City and executed by the commission on the City's behalf. (See the first paragraph of fn. 2, *ante*.) The question is therefore whether the Step 3 hearing officer, conducting the hearing and reporting its result as a single individual, must or may be deemed a "legislative body" of either "local agency" within any of the broad definitions of "legislative body" contained in sections 54952, 54952.3, or 54952.5.

Each of the three sections defines "legislative body" by reference to words stated by the Legislature as synonymous terms. With qualifying adjectives in some instances, which we do not deem significant here (e.g., "governing" in section 54952, "advisory" in section 54952.3, and "permanent," with other more specific terms, in section 54952.5 [see fn. 7, *ante*]), the synonymous words throughout are "board," "commission," "commit-

---

[6]"54951. As used in [the Brown Act], 'local agency' means a county, city, whether general law or chartered, city and county, town, school district, municipal corporation, district, political subdivision, or any board, commission or agency thereof, or other local public agency."

[7]These sections read, in full or in pertinent part, as follows:

"54952. As used in [the Brown Act], 'legislative body' means the governing board, commission, directors or body of a local agency, or any board or commission thereof, and shall include any board, commission, committee, or other body on which officers of a local agency serve in their official capacity as members and which is supported in whole or in part by funds provided by such agency, whether such board, commission, committee or other body is organized and operated by such local agency or by a private corporation."

"54952.3. As used in [the Brown Act] 'legislative body' also includes any advisory commission, advisory committee or advisory body of a local agency, created by charter, ordinance, resolution, or by any similar formal action of a governing body of a local agency."

"54952.5. As used in [the Brown Act] 'legislative body' also includes, but is not limited to, planning commissions, library boards, recreation commissions, and other permanent boards or commissions of a local agency."

(Section 54951.7 also defines "local agency," but is limited to "nonprofit corporations." It is therefore not relevant in the present case. Section 54957, which refers to "executive sessions . . . to consider the . . . dismissal of . . . [an] employee" is also irrelevant because it applies "unless such employee requests a public hearing[,]" as appellant did.)

tee," and "body." "Words and phrases are construed according to the context and the approved usage of the language; . . ." (Civ. Code, § 13.) ■ "Excepting when clearly otherwise intended or indicated, words in a statute should be given their ordinary meaning and receive a sensible construction in accord with the commonly understood meaning thereof." (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 642 [122 P.2d 526]. Cf. *County of Contra Costa* v. *East Bay Municipal Util. Dist.* (1964) 229 Cal.App.2d 556, 564 [40 Cal.Rptr. 495].)

■ According to primary conventional and legal definitions of the synonymous words used in the cited sections (and as pertinent here), each imports the involvement of more than one person. (E.g.: Board: ". . . 4e: A *number of persons* appointed or elected to sit in council . . ." [Webster's Third New Internat. Dict. (1967) (hereinafter "Webster's Dict."), p. 243]; ". . . an *aggregation of officers* . . . a body of *men* . . . a *number of persons* organized to perform a trust or to execute official or representative functions, . . ." [11 C.J.S. 369; see also Ballantine's Law Dict. (3d ed. 1969) p. 142 ("board").] Commission: ". . . 4a: a *group of persons* directed to perform some duty or execute some trust . . . [Webster's Dict., p. 457]; ". . . a body of *persons* . . . a company of *persons* joined in the exercise of some duty . . . a body composed of *several persons* . . ." [15A C.J.S. 6.] Committee: ". . . 2a: a body of *persons* delegated to consider, investigate, or take action upon and . . . to report concerning some matter or business . . . a body of *members* chosen by a legislative body to give special consideration to pending legislation or to other legislative matters . . ." [Webster's Dict., p. 458]; "[a] body of *persons* . . ." [Ballantine's Law Dict. (*op. cit. supra*) p. 225.] Body: ". . . 6: a *group* or *number of persons* . . . : as . . . b: a *group of individuals* united by a common tie or organized for some purpose . . ." [Webster's Dict., p. 246]; ". . . a *collection of persons* . . ." [11 C.J.S. 379]; ". . . legislative body: any body of *persons.* . . ." [*Id.*, p. 381.] [Italics added in each instance.])

None of these definitions reaches the Step 3 hearing officer, who acts alone in conducting the hearing and in reporting its result. As the Legislature has time and again had occasion to concern itself with precision in pertinent language in the Brown Act (see Comment (1966) 54 Cal.L. Rev. 1650, 1653-1657; Note (1962) 75 Harv.L.Rev. 1199, 1205-1206; Herlick, *California's Secret Meeting Law* (1962) 37 State Bar J. 540, *passim*), and has indicated no departure from the conventional definitions just quoted, we perceive no legislative intent to include within any such definition a single individual who functions by himself; such individual,

in sum, cannot be deemed a "legislative body" within the meaning of the Act.

Support for this conclusion appears in other sections of the Act. The broad declaration of purpose contained in section 54950 includes a reference to "the public commissions, boards and councils and the other public agencies in this State," and a direct statement of legislative "intent" that "their actions be taken openly and that their deliberations be conducted openly." The term "actions . . . taken," as used in section 54950, is substantially defined, in section 54952.6, to refer to "action taken" by a number of persons rather than one.[8] The word "deliberations," in the context of section 54950, means "discussion and consideration by a *number of persons* . . ." (Webster's Dict., p. 596); such "deliberations" are amenable to public observation, while a single individual's deliberative thought processes are not. References to its "presiding officer," in sections 54954 and 54956, import that a "legislative body" must consist of collective membership.

From some of the same sources, and by the same reasoning, we also conclude that the Step 3 hearing is not a "meeting" within the meaning of the Brown Act. (We state this as an alternative ground of our decision insofar as the Act is involved.) The Act does not define a "meeting" but, again, conventional definitions of the word refer to the presence of more than one person. (Webster's Dict., p. 1404 ["meeting . . . : an act or process of *coming together* . . . d: a *gathering* for business, social, or other purposes . . ."]; 57 C.J.S. 1044 ["a *number of people* having a common duty or function who have come *together* for any legal purpose . . . ; an *assemblage*."] [Italics added in each instance.]) Again, the definition of "action taken," in section 54952.6 (see fn. 8, *ante*), supports the conclusion that two or more persons are required in order to conduct a "meeting" within the meaning of the Act.

The latter conclusion is supported by the frequent use, in the Act, of collective terminology in references to the personnel of a "legislative body" in connection with a "meeting" of the body. (E.g., § 54954 ["presiding officer"]; § 54955 ["less than a quorum"; "all members"]; § 54956 ["presiding officer," "a majority of the members," "each member," "any member"];

---

[8]"54952.6. As used in [the Brown Act], 'action taken' means a *collective* decision made by a majority of the *members* of a legislative body, a collective commitment or promise by a majority of the *members* of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the *members* of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance." (Italics added.)

§ 54957.9 [disorderly *"meeting room"* may be cleared by *"members* of the legislative body conducting the *meeting"* (italics added)]; § 54959 [*"Each member* of a legislative body who attends a *meeting* of such legislative body where *action is taken* in violation of [the Brown Act], with knowledge [of the violation], is guilty of a misdemeanor." (Italics added.)]}

The same conclusion has been further indicated in several opinions by the Attorney General, who has addressed himself to the Act on many occasions and with substantial authority.[9] (Comment, *op. cit. supra,* 54 Cal.L.Rev. 1650 at pp. 1653-1657. See, particularly, pp. 1653-1654 [fn. 23].) It has also been reflected in suggestions, by legal writers, for the inclusion of a definition of "meetings" in the Act. (See *id.,* at p. 1656 [fn. 38, par. (2)]; Note, *op. cit. supra,* 75 Harv.L.Rev. 1199 at p. 1220 [Appendix, § 1].)

A contrary conclusion is not indicated by judicial decisions in which the term "meeting" has been construed or presented, as appropriate, for purposes of the Brown Act; each decision dealt with an assemblage of several persons, and none involved a one-man performance such as is required of the Step 3 hearing officer in the present case. (See, e.g., *Adler* v. *City Council* (1960) 184 Cal.App.2d 763, 767, 770-775 [7 Cal.Rptr. 805]; *Huntington Beach Union High School Dist.* v. *Collins* (1962) 202 Cal.App.2d 677, 679, 681-682 [21 Cal.Rptr. 56]; *Claremont Taxpayers Assn.* v. *City of Claremont* (1963) 223 Cal.App.2d 589, 593-594 [35 Cal.Rptr. 907]; *Old Town Dev. Corp.* v. *Urban Renewal Agency* (1967) 249 Cal.App.2d 313, 320, 329 [57 Cal.Rptr. 426]; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 45, 46-51 [69 Cal.Rptr. 480]; *Carlson* v. *Paradise Unified Sch. Dist.* (1971) 18 Cal.App.3d 196, 198, 199-200 [95 Cal.Rptr. 650].)

For the foregoing reasons, and upon the alternative grounds of decision stated, we hold that the Brown Act does not require that a hearing conducted by a single individual (such as the Step 3 hearing to which appellant is entitled) be opened to the public, and that the trial court was correct in drawing its conclusion of law (No. 4) to this effect.

---

[9]See, e.g.: 22 Ops.Cal.Atty.Gen. 224 (county boards of supervisors); *id.,* volume 32, pages 240, 242 (referring to "deliberation" by "members" of "boards composed of a number of persons" [citing and quoting *School-Dist. No. 42* v. *Bennett* (1890) 52 Ark. 511 (13 S.W. 132, 133)]); *id.,* volume 42, pages 61, 62 (discussing "gatherings" of a city council with other local officers, in advance of formal council sessions); *id.,* volume 43, pages 36-37 (regular "luncheon meetings" by "members of one or more city councils with representatives of certain civic associations . . . to discuss items of area importance . . ."); *id.,* volume 46, pages 34-35 (referring to "members" of the local agency involved).

We are mindful of the salutary purposes of the Act, and of "evasive techniques" which might be employed to frustrate it (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs., supra,* 263 Cal.App.2d 41 at pp. 49-50);[10] for this reason, and although we do not conceive of the Step 3 hearing as an excursion in such "evasive techniques," we expressly limit our decision to the present facts as they occurred within the context of the "grievance procedure" established under the 1968 agreement between the City and the unions.

### *The 1968 Agreement Does Not Require a Public Step 3 Hearing*

The 1968 agreement is silent as to whether any hearing in the course of the grievance procedure must or may be opened to the public; according to our independent interpretation of its terms (see fn. 2, *ante*), its text supports no inference requiring a public hearing at any stage of the procedure. Appellant's principal argument in this regard is that the agreement must be read to comport with state law, and that the Brown Act requires the Step 3 hearing to be opened to the public. As we have seen, the Act does not require this of any of the one-man hearings involved. Because appellant's premise fails, his argument does; the trial court's conclusion of law No. 1 is correct.

According to our further interpretation of the agreement, the trial court was also correct in concluding that a "hearing under said grievance procedure is not a dismissal hearing" (conclusion of law No. 2), because no hearing officer, at any level of the procedure, may dismiss a Municipal Railway employee; the City's charter, to which the 1968 agreement expressly defers, reserves the dismissal power to the employee's "appointing officer" alone. (See fn. 1, *ante*.) The ostensible purpose of the hearing officers' reports is to reach the "appointing officer," in the last instance, with facts and recommendations relative to proposed disciplinary action. The trial court was therefore correct in its conclusion of law (No. 3) to this effect.

---

[10]Granted the validity of its purposes, the Brown Act and similar state laws are not entirely without their critics. (See Note, *op cit. supra,* 75 Harv.L.Rev. 1199 at p. 1219 [text at fns. 146 and 147, quoting Carpenter and others].) This fact has likely contributed to the "many unpassed legislative bills which would have imposed more restrictive procedures on local government." (Herlick, *op. cit. supra,* 37 State Bar J. 540 at p. 550.)

### A Closed Step 3 Hearing Does Not Deprive
### Appellant of Due Process of Law

█ Appellant's contention in this regard rests upon the theory that the concept of due process of law entitles him to a *public* hearing at all stages of a procedure which involves his proposed dismissal from employment. We disagree. In the decisions upon which appellant relies, it was emphasized that a person in a comparable situation is entitled to *a* hearing which, by reason of due process requirements, must be "a fair hearing," at which he has the right to present evidence and to confront and cross-examine witnesses, before an "unbiased tribunal." (E.g., *Falcone* v. *Dantinne* (3d Cir. 1969) 420 F.2d 1157, 1165. See also *Parks* v. *International Brotherhood of Electrical Wkrs.* (4th Cir. 1963) 314 F.2d 886, 911-912.) None of these decisions supports the conclusion that appellant is entitled to a *public* hearing at Step 3, or at any level, of the grievance procedure.

Moreover, the City's charter absolutely entitles him to a public hearing when the proceedings attendant upon his actual dismissal reach the appropriate stage. (See fn. 1, *ante.*) For these reasons, we conclude that the denial of a public hearing, at the Step 3 level of the grievance procedure established by the 1968 agreement, does not deprive appellant of due process of law.

The judgment is affirmed.

Devine, P. J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.