This case presents two certified questions from the United States District Court for the Middle District of Alabama. This Court has jurisdiction to answer such questions under Article VI, § 6.02 (b)(3), of the Constitution of 1901, as amended by Amendment Number 328. See also Rule 18, Alabama Rules of Appellate Procedure.
The certified questions, isolated from the certification's statement of facts, read:
 "(1) Was the July 10, 1984, meeting at the Department of Mental Health and Mental Retardation subject to the Alabama Sunshine Law; and, if so, did the law require that the meeting be open?
 "(2) Is the Alabama Medicaid Agency subject to the Alabama Sunshine Law; and, if so, did the law require that the November 16, 1984, meeting of the Agency be open?
The Alabama Sunshine Law, Code 1975, § 13A-14-2, reads:
 "(a) No executive or secret session shall be held by any of the following named boards, commissions or courts of Alabama, namely: Alabama public service commission; school commissions of Alabama; board of adjustment; state or county tax commissions; any county commission, any city commission or municipal council; or any other body, board or commission in the state charged with the duty of disbursing any funds belonging to the state, county or municipality, or board, body or commission to which is delegated any legislative or judicial function; except, that executive or secret sessions may be held by any of the above named boards or commissions when the character or good name of a woman or man is involved.
 "(b) Any person or persons violating any of the provisions of this section shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than $10.00 nor more than $500.00. Any person who remains in attendance upon any meeting of any of the above named boards or bodies which is being held in secret or executive session shall be deemed guilty of violating the provisions of this section."
The certification sets forth the following facts:
 "A. The Advertiser Company, etc., v. Wallis, etc., et al.
 "The Commissioner of Mental Health and Mental Retardation of the State of Alabama and the Governor of Alabama, pursuant to Act No. 84-242, Acts of Alabama 1984, constitute a public corporation known as the Department of Mental Health and Mental Retardation of the State of Alabama (`Department'). The Commissioner, as chief administrative official in charge of the operation of the Department, held a meeting for the purpose of resolving differences between the Department and a labor union and of consummating and executing a contract with that labor union regarding conditions *Page 1367 
of employment of employees at state mental facilities. The meeting was held on July 10, 1984, at the Department offices, 200 Interstate Park, Montgomery, Alabama. The public and the media were barred from this meeting. It consumed three hours.
 "Those who attended the meeting were the Commissioner, the Associate Commissioner for Personnel and Administration, the Department Director of Administrative Services, the State Labor Commissioner, and the business manager, president, and secretary-treasurer of the union. The subject matter of the meeting was the negotiation of a contract with a labor union regarding public employees; and there existed a very serious situation with the possibility of a strike, walk-out, call-in or some other interruption in essential mental health services. Such a strike would have had a substantial negative impact on the operation of the mental health system.
 "Principal items discussed at the meeting were asserted delays in the grievance procedures; overtime policies; union participation in policy making procedures; and enforcement of automobile traffic regulations at and near the mental hospitals.
 "The pervasive subject matter of the meeting was the union contract. At this meeting an agreement was reached as to all major issues; and a written contract embodying the agreement was signed by the Commissioner for the Department a few days later. Among the duties of the Department is that of disbursing funds belonging to the State of Alabama. The Advertiser Company [a newspaper publisher] contends that discussion of the character or names of individuals did not constitute a significant part of this meeting. The Department contends that such discussion did occur as a part of the meeting. It is contended by the Advertiser Company that the negotiations and subsequent union contract were illegal and in violation of the Alabama Supreme Court's decision in Nichols v. Bolding, [291 Ala. 50, ] 277 So.2d 868 (1973), because there was no express statutory or constitutional authority permitting the Department, a public body, to contract with a labor union regarding wages, hours or conditions of employment of public employees.
"B. The Advertiser Company, etc., v. Baggiano, etc.
 "The Alabama Medicaid Program is a cooperative state and federal program designed to provide medical services to eligible indigent persons in the state. Federal statutes, rules and regulations govern how a state may administer this cooperative program. In addition, the state has established its own rules and regulations under which, in conjunction with the federal rules, the program is administered. In Alabama, the program is conducted by the Alabama Medicaid Agency which contracts with hospitals, physicians, nursing homes, pharmacists, medical equipment suppliers, and other similar `providers' of medical services to provide services to those Alabama residents who are eligible for Medicaid benefits. Pursuant to such contracts, the providers submit claims to the Medicaid Agency for reimbursement for medical services rendered by said providers to eligible Medicaid patients. After reviewing and approving a claim from a provider, the Medicaid Agency makes payment to the provider by drawing from both state and federal funds.
 "The Medicaid Agency operates as an arm of the Office of the Governor of Alabama. The Governor of the State of Alabama was designated by Executive Order No. 83, September 26, 1977, as the single state agency to develop and administer the state plan for medical assistance, which is otherwise known as `Medicaid.' The Governor of Alabama delegated by executive order his responsibility for administering the program to the `Alabama Medicaid Agency.' The Governor appoints the Medicaid Commissioner to oversee the administration of this program. Mrs. Faye S. Baggiano is the current commissioner of Medicaid. *Page 1368 
 "In 1984, the Medicaid Agency performed an audit on one of its providers, Baptist Medical Center in Montgomery, Alabama. The purpose of the audit was to review and examine expenditures of the provider to assure that the provider had properly reported medical expenditures to Medicaid. On November 16, 1984, a meeting was held between members of the Alabama Medicaid Agency and Baptist Medical Center to discuss the results of the audit. This meeting is known in accounting terminology as an `audit exit interview,' which is typically a meeting held at the end of an audit to resolve problems before publishing the audit findings. The meeting with Baptist Medical Center was to afford the provider an opportunity to comment on the audit and offer suggestions before the audit became final. This audit process is part of the normal functions of the Medicaid Agency.
 "At the November 16, 1984, meeting, there was no promulgation, revision or formulation of any rule, regulation or policy regarding the administration or conduct of the Alabama Medicaid Agency or the Alabama Medicaid Program. The meeting was held for the purpose of discussing with officials of a private entity, Baptist Medical Center, questions arising as a result of an audit of the provider's neo-natal care unit.
 "The public, including members of the media, were excluded from this meeting and it was held in executive or secret session. Present at the meeting from Medicaid Agency were its Commissioner; its chief auditor and her supervisor, [the] Medicaid Agency fiscal manager; three additional Agency auditors; the head of its hospital program; the chief of its program integrity; and its attorney. Present for Baptist Medical Center were its chief fiscal officer, its operations vice president and two auditors from the national accounting firm of Ernst Whinney.
 "This meeting concerned the disbursement of public funds, in that the results of the audit affected reimbursement to Baptist Medical Center. It did not concern the character or good name of any person. The details of the audit were made public after the meeting and the audit discussed at the meeting was not of a sensitive nature. The meeting lasted approximately three hours. Because the Commissioner was advised by her counsel that the Alabama Sunshine Law did not apply at all to any meetings of Medicaid Agency, and that any and all meetings of that agency could be held in executive or secret session without violating the Alabama Sunshine Law, the Commissioner excluded the public and members of the media from the meeting. In the absence of such advice from counsel, the Commissioner would have opened this meeting to the public."
The Sunshine Law applies to a few named commissions, boards, and councils, not including the Department of Mental Health and Mental Retardation or the Medicaid Agency, and to "any other body, board or commission" which disburses public funds or exercises legislative or judicial functions. Both the Department and the Agency disburse public funds, so the question is whether either is a "body, board or commission" within the ambit of the statute.
Webster's Third New International Dictionary of the EnglishLanguage (Unabridged) (1971) includes the following pertinent definitions:
 "commission: a group of persons directed to perform some duty or execute some trust: a body of commissioners; a government agency having administrative, legislative, or judicial powers."
 "board: a number of persons appointed or elected to sit in council for the management or investigation of a public or private business, trust, or other organization or institution."
 "body: a group or number of persons or things: as . . . a group of individuals united by common ties or organized for some purpose." *Page 1369 
Thus, these words all denote a group of individuals acting together to perform some purpose. We think significant also the phrase found in the definition of "board," that the persons "sit in council." As we shall set forth more fully in the following discussion, we find that the entities to which the Sunshine Law applies are only those governed by a group of individuals who sit as a deliberative body to set policy regarding the public matters with which the entity is entrusted. Indeed, it is meetings at which this group deliberation and decision making take place that must be open to the public.
The Department of Mental Health and Mental Retardation acts "through its commissioner." Code 1975, §§ 22-50-9 and -11, as amended by Act 84-242, 1984 Ala. Acts. As noted in the District Court's certification, the governor and the commissioner of mental health and mental retardation constitute a public corporation known as the Department of Mental Health and Mental Retardation. Section 22-50-4, as amended. The statutory scheme does not contemplate the governor and the commissioner meeting as a board or commission, but only that "[t]he commissioner shall serve at the pleasure of the governor." Section 22-50-16, as amended.
The department does have a board of trustees, but the statute makes the board advisory only:
 "In order to coordinate the activities of the department of mental health and mental retardation and to advise with such department and to better acquaint the public with the needs and activities of such department, there is hereby created a board of trustees for the department of mental health and mental retardation to be composed of 16 members."
Code 1975, § 22-50-5 (a), as amended. In contrast, the mental health board of the former department of mental health was the governing body of the department. Code 1975, e.g., §§ 22-50-4, -9, -11, as enacted by Act 881, 1965 Ala. Acts.
Similarly, with the Medicaid Agency, the Medicaid Commissioner is appointed by and serves at the pleasure of the governor. The commissioner administers the agency subject to the approval of the governor. The briefs and record indicate that the Medicaid Agency meets with a medical care advisory committee and holds an annual public conference to discuss the program. Furthermore, the agency is subject to extensive Federal regulations.
As can be seen from the above description of the functioning of these two entities and from the Federal court's certification of facts, neither of the meetings in question was a meeting of a "body, board, or commission" charged with disbursing public funds. Thus, the meetings were not subject to the Sunshine Law.
The only decisions on point cited by the parties or disclosed by our research support the proposition that the Sunshine Laws of the various jurisdictions apply to meetings of multi-member bodies, not those of agencies or departments administered by a single individual.
A Florida appellate court has held that meetings between a president of a junior college and his staff or representatives of college employees are not meetings governed by the Sunshine Law. Bennett v. Warden, 333 So.2d 97 (Fla.Dist.Ct.App. 1976). In Wood v. Marston, 442 So.2d 934 (Fla. 1983), the Supreme Court of Florida somewhat limited the holding in Bennett by approving the holding that "fact-finding staff consultations are not subject to the Sunshine Law," id., at 940, but disapproving the implication that any "official act which is in and of itself decision-making can be `remote' from the decision-making process, regardless of how many decision-making steps go into the ultimate decision," id., at 941. Thus, underWood v. Marston and other Florida cases, if a governing body delegates part of its decision-making power to a committee of staff members, the committee's meetings are as much subject to the Sunshine Law as the governing body's meetings. This still assumes, however, that the governing body is a group that holds meetings subject to the *Page 1370 
Sunshine Law. We do not find Cape Publications, Inc. v. City ofPalm Bay, 473 So.2d 222, 225 (Fla.Dist.Ct.App. 1985), inconsistent with this interpretation, even though it states that "it is the nature of the act to be performed, not the make-up of the group, that determines the application of the statute." Even so, the meeting must be one held by a group, not between an individual administrator and other individuals.
As examples of cases generally on the point that meetings subject to the various states' Sunshine Laws are meetings of members of deliberative groups, we note People ex rel. Difanisv. Barr, 83 Ill.2d 191, 46 Ill.Dec., 678, 414 N.E.2d 731
(1980); City of New Carrollton v. Rogers, 287 Md. 56,410 A.2d 1070 (1980); Woodbury Daily Times Co. v. Gloucester CountySewerage Authority, 151 N.J. Super. 160, 376 A.2d 607
(N.J.Super.Ct.Law Div. 1977), aff'd, 158 N.J. Super. 448,386 A.2d 445 (N.J.Super.Ct. App. Div. 1978).
The Federal Sunshine Act, 5 U.S.C. § 552b (1982), enacted in 1976, requires agencies "headed by a collegial body composed of two or more individual members" to conduct open meetings. Id., § 552b (a)(1). In remarks on the application of this law, the chairman of the Section of Administrative Law of the American Bar Association has written:
 "No one would contend that multi-member agencies should operate entirely behind closed doors. It would appear, however, that the Sunshine Act in operation may well have diminished the collegial character of agency decision making, created a reluctance of agency members even to discuss certain important agency matters, and shifted the decision-making process to one-on-one discussions between members, exchanging views at the staff level, and exchanging views by written memoranda."
Chairman's Message, 37 Admin. Law Rev. v (1985). This is at least one indication that the trend of administrative law is not in the direction the Advertiser Company urges, i.e., toward extending Sunshine Laws to agencies and departments which do not function under a multi-member governing body.
The two recent cases decided by this Court regarding the Sunshine Law are not on point. Both involved bodies specifically named in the Sunshine Law. Dale v. Birmingham NewsCo., 452 So.2d 1321 (Ala. 1984) (school board); Miglionico v.Birmingham News Co., 378 So.2d 677 (Ala. 1979) (city council).
For the foregoing reasons, we answer the certified questions by replying that neither the meeting of the commissioner of mental health and mental retardation with members of his staff and union representatives nor the meeting of the commissioner of Medicaid with members of her staff and representatives of a hospital was subject to the Alabama Sunshine Law.
QUESTIONS ANSWERED.
All the Justices concur.