JOHN E. PEARSON & others[1] *vs.* BOARD OF SELECTMEN OF
LONGMEADOW.

No. 98-P-762.

Hampden. October 7, 1999. - April 14, 2000.

Present: PORADA, DREBEN, & BECK, JJ.

*Open Meeting Law. Municipal Corporations,* Open meetings. *Statute,* Con-
struction. *Words,* "Quorum," "Subcommittee."

The provisions of G. L. c. 39, §§ 23A and 23B, the open meeting law, did not
apply to a nonpublic meeting attended by the chairman of the board of
selectmen of Longmeadow, the mayor of Springfield, two other officials of
the city of Springfield, and two residents of Longmeadow, where such a
group did not constitute a quorum of a governmental body or a subcom-
mittee thereof within the meaning of the language of the statute. [123-125]

CIVIL ACTION commenced in the Superior Court Department on
June 11, 1996.

The case was heard by *Bertha D. Josephson,* J.

*Bernard W. Fang* for the plaintiffs.

*Michael K. Callan (David J. Martel* with him) for the
defendant.

DREBEN, J. This appeal concerns the applicability of G. L.
c. 39, §§ 23A and 23B, the open meeting law, to a nonpublic
meeting attended by the chairman of the board of selectmen of
Longmeadow, officials of the city of Springfield, and others. A
judge of the Superior Court, after a jury-waived trial, held that
there was no violation of c. 39 by reason of the chairman's at-
tendance. We affirm the judgment.

The facts found by the trial judge, supplemented in minor
details by uncontroverted testimony, are as follows. In the spring
of 1996, the city announced plans to reopen a part of Forest
Park known as the King Philip Stockade (Stockade). Before its

---

[1]Joseph P. Curran and Ann W. Gilman, two other registered voters of the
town of Longmeadow.

closure in 1980, the Stockade had been open to the public via Western Drive Access Road, a road which extended from Western Drive over a strip of land owned by Longmeadow into the Stockade. Residents from the Western Drive area of Longmeadow immediately became concerned about the impact that vehicular traffic to and from the Stockade would have on their neighborhood. In the beginning of May, Springfield officials indicated that they would open the Stockade on May 24 and would use the Western Drive Access Road. Discussions between Longmeadow residents and Springfield officials were not reassuring to Longmeadow, and an emergency meeting of the Longmeadow board of selectmen (board) was scheduled for Wednesday, May 22, 1996, at 5:30 P.M. Notice of the meeting was properly given. On the afternoon of May 22, the chairman of the board, after consulting with the other selectmen and the board's executive secretary, decided to cancel the meeting.

Instead, a nonpublic meeting was held.[2] Present at that meeting were two Western Drive residents,[3] the board's executive secretary, the chairman of the board, the mayor of Springfield, and two other Springfield officials.[4] The mayor proposed that the use of Western Drive Access Road be temporary until Springfield could construct a new entrance. The chairman suggested that the mayor delay the opening of the Stockade for ten days to allow time for the board to consider and vote on any proposal. In the meantime, Longmeadow's town counsel and

---

[2] The judge found: "The purpose of the meeting was to allow [the mayor of Springfield] to present a proposal regarding the controversy to [the chairman of the board, the two residents and the executive secretary of the board], who would then convey the proposal to the full board. [The chairman], along with other board members, believed that to avoid a confrontational exchange between Springfield and Longmeadow, the best course of action was to allow the Mayor to present his proposal to one member of the Board. Further as a negotiation tactic, the Board provided only one Board member so that no decision could be made at the meeting. [The chairman] was not given any authority to act on behalf of the Board nor to bind the Board in any manner."

[3] These two residents had been appointed to serve on an advisory committee created by the board to represent Western Drive residents' concerns on the Stockade issue. The record indicates that a selectman, not the chairman, was also a member of that advisory committee. The plaintiffs do not claim that the presence of two members of the advisory committee at the May 22 meeting constituted a violation of the open meeting law, and we do not consider that question.

[4] "Meeting Notes" of the meeting were taken by the board's executive secretary.

the Springfield city solicitor's office were to draft a proposed agreement prior to the board's meeting.

Following the May 22, 1996 meeting, an open community meeting, announced by fliers, was held on May 28 to discuss the suggestion made by the mayor. Fifty to sixty residents attended the meeting, including the two Western Drive residents who had been present at the May 22 meeting. Also present were one of the plaintiffs and one of the defendant selectmen. There appeared to be very little opposition to the plan.

On May 30, 1996, the full board met, discussed, and voted on the proposed agreement which had been drafted in the interim by counsel for Springfield and Longmeadow. At least one handwritten change was made to the agreement at the board's meeting.

Thereafter, one of the plaintiffs sought an opinion from the Hampden County district attorney's office that the open meeting law had been violated by the May 22 meeting. The district attorney concluded otherwise,[5] and this action followed.

Relying on *Nigro* v. *Conservation Commn. of Canton*, 17 Mass. App. Ct. 433 (1984), the plaintiffs claimed to the trial court, and now argue on appeal, that the chairman was a subcommittee of the board, that he participated in discussing the terms of the proposal presented to the board, and that he, therefore, recommended the proposal. He did not merely receive a proposal for delivery to the board, but rather an agreement was negotiated with discussion between the parties. The *Nigro* court held that when a quorum of the subcommittee of the Canton conservation commission engaged in making findings of fact or formulating recommendations, and such findings and recommendations were to be submitted to the commission, the subcommittee was required to comply with the open meeting law. *Id.* at 435 n.4 & 436. In *Nigro*, as in the case at bar, the

---

[5]After investigation, the district attorney's office concluded that although the chairman was in essence a subcommittee of the board, the meeting was an informational or fact-gathering session in which no commitment was made by the chairman that would constitute a decision. "Because no votes were taken, and no decisions were made during the conversations between [the chairman] and [the mayor] on May 22, there were no 'deliberations.' . . . As opposed to the informational meeting on May 22, the actual deliberations and decisions regarding the Western Avenue entrance to the King Philip's Stockade took place on May 30."

The opinion also stated that, had there been a violation on May 22, "the May 30 meeting corrected any prior error."

subcommittee could merely make recommendations; only the commission — here only the board — could make the decision; therefore, the plaintiffs argue, *Nigro* is controlling.[6]

The trial judge thought otherwise. After referring to the definitions of "meeting" and "deliberation" as contained in § 23A, which, together with the other relevant portions of the statute, are set forth in the margin,[7] she concluded: "[f]or a meeting to take place, there must be 'deliberation' by a 'governmental body' in order to arrive at a 'decision.' " She

---

[6]The plaintiffs rely particularly on the following language of *Nigro*, 17 Mass. App. Ct. at 436: "We think it axiomatic that any report of facts which the subcommittee may make to the full commission after conducting whatever investigation may be appropriate in the circumstances is necessarily grounded on one or more decisions as to what the facts are. And, of course, the subcommittee cannot formulate a recommendation without deciding what it should be."

[7]The relevant portions of c. 39, §§ 23A and 23B, are as follows:

"§ 23A. Definitions.

"The following terms as used in sections twenty-three B and twenty-three C shall have the following meanings: —

" 'Deliberation', a verbal exchange between a *quorum* of *members* of a governmental body attempting to arrive at a decision on any public business within its jurisdiction [emphasis added]. . . .

" 'Governmental body', every board, commission, committee or subcommittee of any district, city, region or town, however elected, appointed or otherwise constituted, and the governing board of a local housing, redevelopment or similar authority; provided, however, that this definition shall not include a town meeting. . . .

" 'Meeting', any corporal convening and deliberation of a governmental body for which a quorum is required in order to make a decision at which any public business or public policy matter over which the governmental body has supervision, control, jurisdiction or advisory power is discussed or considered; but shall not include any on-site inspection of any project or program.

" 'Quorum', a simple majority of a governmental body unless otherwise defined by constitution, charter, rule or law applicable to such governing body."

"§ 23B. Open meetings of governmental bodies.

"All meetings of a governmental body shall be open to the public and any person shall be permitted to attend any meeting except as otherwise provided by this section.

"No quorum of a governmental body shall meet in private for the purpose of deciding on or deliberating toward a decision on any matter except as provided by this section."

Section 23B also provides for executive sessions but, quite rightly, no argument is made that those provisions apply.

distinguished *Nigro*, pointing out that in that case a three-person subcommittee of the seven-member conservation commission of Canton was charged with making "factual investigations, reporting its findings to the full commission, and making verbal recommendations as to actions which should be taken by the commission." *Nigro*, 17 Mass. App. Ct. at 434. Relying on her finding that the purpose of the May 22 meeting was to allow the mayor to present his proposal to those present, including the chairman of the board who was to convey the proposal to the full board, she found that, unlike the subcommittee in *Nigro*, the chairman did not have the authority to act on behalf of the board to make any decisions at the meeting. "He did not engage in any deliberations as are required for a subcommittee to be cast under the open meeting law."

In view of the wide-ranging discussions at the May 22 meeting participated in by the chairman, as reflected in the "meeting notes" taken by the executive secretary of the board,[8] and in view of the detailed agreement drafted by counsel for the two municipalities after the meeting of May 22 and prior to May 30, the trial judge's narrow interpretation of "deliberation" poses some difficulty of application. Although her conclusion was right that the open meeting law was inapplicable to the May 22 meeting, we focus our opinion on other concepts in that law. See *Alholm* v. *Wareham*, 371 Mass. 621, 625 (1976).

We turn to the statute and its two central provisions which appear in § 23B. See note 7, *supra*. These provide that "[a]ll meetings of a governmental body shall be open to the public" and that "[n]o quorum of a governmental body shall meet in private for the purpose of deciding on or deliberating toward a

---

[8]Among other matters, the meeting notes, the accuracy of which are not challenged, indicated the following. The chairman not only traced the chronology of events and communications with regard to the reopening of the Stockade, but emphasized Longmeadow's position that a Western Drive access was not an option. He stated Longmeadow's legal position, contested by the mayor, that Longmeadow owned the treebelt at the Western Drive entrance. He also suggested "what he considered to be the minimal disruptive solution. This would be for Springfield to obtain the funds, fix the Route 5 entrance [an alternative entrance] and then open the Stockade." A written agreement was discussed and it was agreed that counsel for the two municipalities would draft an agreement. "The Mayor suggested that a public statement be issued noting that there was an agreed upon Action Plan between the City of Springfield representatives and the Town of Longmeadow representatives subject to further input from the other members of the Board of Selectmen and discussion with Western Drive area residents."

decision on any matter except as provided by this section" (i.e., allowing certain matters to be decided in executive session — provisions not here applicable). Although a governmental body includes all subcommittees, and although the parties and the trial judge have characterized the chairman of the board as a "subcommittee" appointed by the board, neither the *Nigro* case, 17 Mass. App. Ct. at 435 n.4, nor the statute provides support for the proposition that a single member of a governmental body who attends a meeting with others who are not members of the same governmental body — indeed, with officials of another municipality — is a "subcommittee" within the meaning of the open meeting law.

The "plain and ordinary meaning" of the language of §§ 23A and 23B, looked at as a whole, see *Johnson's Case,* 318 Mass. 741, 747 (1945), dictates otherwise. Thus, "deliberation" is defined as "a verbal exchange between a *quorum* of members of a governmental body"; "meeting" is defined as "any corporal convening and deliberation of a governmental body for which a *quorum* is required . . ."; and "quorum" is defined as "a simple majority of a governmental body unless otherwise defined . . ." (emphasis supplied). That the first sentence in § 23B is immediately followed by the second sentence which states that no quorum of a governmental body shall meet in private, reinforces the conclusion that a meeting of a "subcommittee" of a governmental body as defined in § 23A does not include a subcommittee of one.

The definition of the term "quorum" and its use in the definitions of "meeting" and of "deliberation" indicate that the term is meant to signify group action. This meaning is borne out by dictionary definition and is suggested by case law. See, e.g., Webster's Third New Intl. Dictionary 1868 (1993), defining "quorum" as "the number of members of an organized body of persons (as a legislature, court, or board of directors) that when duly assembled is legally competent to transact business in the absence of the other members." See also *Advertiser Co.* v. *Wallis,* 493 So. 2d 1365, 1368-1370 (Ala. 1986) (where Sunshine Law applied to "any . . . 'body, board or commission' which disburses public funds," it is applicable only to "those [entities] governed by a group of individuals who sit as a deliberative body to set policy regarding the public matters with which the entity is entrusted"; it does not apply to the public corporation known as the Department of Mental Health and Mental Retarda-

tion, which is composed of the governor and the commissioner, where the statutory scheme contemplates that the commissioner shall serve at the pleasure of the governor); *Wilson* v. *San Francisco Mun. Ry.*, 29 Cal. App. 3d 870, 878-879 (1973) (use of terms "board," "commission," "committee," and "body" indicates that single individual acting as a hearing officer is not covered by California's open meeting law [the Brown Act]). Cf. *Connelly* v. *School Comm. of Hanover*, 409 Mass. 232, 237 n.9 (1991) (because the superintendent of schools is not a "board, commission, committee or subcommittee" of the town of Hanover, informal selection committee designated to assist him is also not a committee of the town).

Although we decide there was no violation of the open meeting law by reason of the attendance of the chairman of the board at the May 22 meeting, we are in accord with the opinion of the Hampden County district attorney's office that, had there been a violation, it would have been cured by the independent deliberative action taken at the meeting of the full board on May 30, 1996. *Benevolent & Protective Order of Elks, Lodge No. 65* v. *City Council of Lawrence*, 403 Mass. 563, 566 & n.6 (1988).[9] See *Tolar* v. *School Bd. of Liberty County*, 398 So. 2d 427, 429 (Fla. 1981) (Sunshine Law violations can be cured by independent final action in the sunshine that is "not merely a ceremonial acceptance . . . and . . . a perfunctory ratification of secret decisions").

The plaintiffs' remaining contentions are that the telephone cancellation of the scheduled open meeting and attendant decision to have the chairman be present at a nonpublic meeting were in violation of the open meeting law. The trial judge found that these decisions were made by the chairman in consultation with others. Even assuming that they were made by a majority of the board, to require such ministerial acts as scheduling or canceling meetings to be decided in open meetings not only would be impractical but also would put burdens on public servants not imposed by or within the purpose of the statute. While the decision to have the chairman alone attend the meeting has some aspects of public policy (see definition of meeting in note 7, *supra*), in the circumstances here, where a full board

---

[9]We also note that the open community meeting of May 28, albeit not held by the board, "helped to accomplish the purpose of the open meeting law." *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 558 (1988).

meeting was certain to follow, it may reasonably be viewed as one of procedure, namely a deferral of consideration of the matter by the full board. To mandate a public meeting for each procedural or housekeeping decision would severely hamper a board's ability to perform its duties.[10] In the absence of a showing of a purpose to evade the open meeting law, we decline to impose such onerous requirements.

*Judgment affirmed.*

---

[10]We do not suggest that every procedural matter is immune from the open meeting law.